(No. 7004. July 11, 1942.)

BERT BENSON, Appellant, v. HAL R. JARVIS, Respondent.

[127 Pac. (2d) 784.]

Elam & Burke and Clarence L. Hillman for appellant.

Claude V. Marcus for respondent.

BUDGE, J.—Appellant filed a claim with the Industrial Accident Board, and thereafter filed his application for hearing. In his claim, he alleges inter alia that he sustained a personal injury by accident by contracting silicosis while he

was working for respondent at the Hayfork Mine operated by respondent and located near Idaho City, Boise County, Idaho; that by reason of so contracting silicosis he became totally and permanently disabled from performing work and labor; that such personal injury was caused by respondent's negligent operation of the mine. The claim was resisted, and upon a hearing regularly had before the board, compensation was denied and appellant's application dismissed, and an order entered to that effect, from which order this appeal is prosecuted.

Among other findings of fact, the board found:

"That the said claimant is 62 years of age, and for the past 35 years has been engaged almost continuously in mining * * *; that while so engaged in said occupation as a miner, he has been exposed to inhalation of silica dust to such a degree that he now has, and all during the time he was in the employ of said defendant had, silicosis grade 2; that at sometime in the past the claimant also suffered with tuberculosis, the healed lesions of which are visible in an x-ray photograph of his lungs; that as a result of the said silicosis and of the condition of his lungs resulting therefrom and from the tuberculosis he previously had, he now has a disability for work equivalent to and comparable with the loss of one hand at the wrist. (Finding No. 3.)

"* * * the claimant, Bert Benson, made a claim for compensation under the Workmen's Compensation Law on account of a personal injury by accident occurring between July 18, 1941, and October 5, 1941, while working in 'mine, stopes and raises where blasting carried on creating extreme dust conditions * * *, powder smoke and gas resulting in poor ventilation, also timber gas' while working in said Hayfork mine and alleging the same to have caused injury to his 'lungs, lighting up latent tuberculosis, and causing, aggravating, and accelerating silicosis', and claiming to be 'totally and permanently disabled since October 4, 1941' * * *. (Finding No. 4.)

"That the Hayfork Mine operated by the defendant, Hal R. Jarvis, and in which the claimant worked as above stated, consists of four tunnels, two of which run entirely through the mountain in which the mine is situated, and second and fourth being connected by a raise from the fourth tunnel approximately 40 or 50 feet from the opening of the second tunnel, and the third tunnel running from the

portal into the mountain beyond said raise and being connected with said raise running from the fourth to the second; that out of the raise running between the fourth and second tunnel and about 40 feet below the third tunnel there is a drift approximately 20 feet long, which now is also connected by a raise from it with the third tunnel; that the draft of air in the second and fourth tunnel is so strong, and during the time the claimant worked in said mine was so strong, that when a person stands, or stood, in one of them 'it almost blew your hat off'. (Finding No. 5.)

"That while he worked in said Hayfork Mine as above stated, the claimant drilled with drill steel and hand hammer and at no time used any machine drills; that when drifting he also moved muck from the place he had blasted to where it was loaded on wheelbarrows to be taken out of the mine; that at all places where he drilled and mucked, the ground was damp, and that due to the draft through the second and fourth tunnels and the ventilation resulting therefrom in all other parts of the mine, the air in which claimant worked circulated to such as extent that there was sufficient fresh air in which to work without injury; that in the evenings when claimant would come off his working shift, his hands, face, and clothing would be grimy as a result of his work. (Finding No. 6.)

"That the said defendant did not negligently or unlawfully operate the said Hayfork Mine during the time the claimant was employed therein, and that at no time was there not sufficient or adequate ventilation in said mine for carrying off silica laden dust, and dust laden with powder smoke and gas and timber gas; but that at all times the claimant worked therein the natural ventilation was adequate to provide sufficient and adequate ventilation in said mine; that the defendant did not furnish claimant with a mask for his protection; that under the conditions appertaining in said mine, it was not bad mining practice not to furnish such a mask. (Finding No. 8.)

"That after the claimant had worked * * * for about fifteen or twenty days, he became ill and gradually lost appetite and had some shortness of breath; that claimant then visited a physician in the city of Boise, who examined him and found that he was suffering with chronic silicosis, grade 2, and that he had had tuberculosis, the lesions of which were then healed; * * *. (Finding No. 9.)

"*That the work the claimant did for the defendant did not cause the silicosis from which he is now suffering and did not cause or light up, or aggravate tuberculosis, and did not aggravate the silicosis more than any other work would have done if it aggravated it at all; that neither the onslaught of silicosis nor the aggravation thereof was sudden.* (Finding No. 10.) (Italics ours.)

"That the claimant, Bert Benson, did not between the 18th day of July, 1941, and the 5th day of October, 1941, or while in the employ of the defendant, Hal R. Jarvis, sustain a personal injury by accident arising out of and in the course of his employment. (Finding No. 11.)

"That the claimant is not actually incapacitated, because of the silicosis with which he is suffering, from performing any work in any remunerative employment and has only a partial disability due to said silicosis and the tuberculosis with which he had previously been afflicted; that the silicosis which he now has is not complicated with tuberculosis of the lungs." (Finding No. 12.)

Based upon the foregoing findings of fact, the board made the following ruling of law:

"That the claimant, Bert Benson, is not entitled to an award against the defendant, Hal R. Jarvis, for compensation either under the Workmen's Compensation Law or the Occupational Disease Compensation Law; that his claim for compensation should be denied and his application dismissed; that an order should be given, made, filed and entered accordingly."

Whereupon the board made the following order:

"WHEREFORE, IT IS ORDERED, AND THIS DOES ORDER, That the claimant, Bert Benson, take nothing by this proceeding, and that his claim for compensation be denied and his application dismissed."

The following principles of law are well settled in this jurisdiction, namely, that in compensation cases, claimant has the burden of proving his case by a preponderance of the evidence; (*Leach v. Grangeville Highway District*, 55 Ida. 307, 41 P. (2d) 618; *Cunningham v. Armour & Co.*, 133 Neb. 598, 276 N.W. 393; *Wilhelm v. Narregang-Hart Co.*, 66 S.D. 155, 279 N.W. 549.) that the credit and weight to be given the testimony in Industrial Accident proceedings is for the Industrial Accident Board; (In re

MacKenzie, 54 Ida. 481, 33 P. (2d) 113; *Bussy v. Industrial Accident Com.*, 26 Cal. A. 211, 79 P. (2d) 169.) that Industrial Accident Board's findings are conclusive upon appeal if supported by competent evidence, this court's jurisdiction being limited to questions of law. (*Stroscheim v. Shay*, 63 Ida. 360, 120 P. (2d) 267.)

The pertinent question for determination is whether or not there is any substantial, competent evidence to sustain the board's findings of fact upon the material points involved. If an examination of the record discloses that the findings of the board are supported by substantial, competent evidence, such findings will not be disturbed upon appeal. (I.C.A., 1932, secs. 43-1408, 43-1409, 43-1413, as amended by S.L. 1937, chap. 175, p. 288; Const., art. 5, sec. 9, as amended, see S.L. 1937, p. 498.) Conversely, should the record fail to support, by substantial, competent evidence, the board's findings, they are not binding or conclusive, and upon appeal will be set aside. Whether such findings are supported by substantial, competent evidence is a question of law to be determined by the court. (*Paull v. Preston Theatres Corp.*, 63 Ida. 594, 124 P. (2d) 562.)

We will first consider the evidence for the purpose of determining whether or not there is any substantial, competent evidence to support the board's finding number 10, which is the crux and controlling question presented.

Appellant testified in answer to the following questions:

"Q. Do you think in your mind that you contracted silicosis while working for Mr. Jarvis?

\* \* \*

"A. No, I don't. I don't think so."

Dr. Swindell, appellant's witness, among other things, testified upon this point:

"Q. Now, you are quite certain, Doctor, that this silicotic condition was not incurred while he was working at Mr. Jarvis' mine during the period he told you about?

"A. Not all of it, no. Judging from the history, it is a thing which has been accumulating over a period of years.

\* \* \*

"A. \* \* \* it takes a considerable period of time and exposure before the evidence of silicosis is manifested by the x-ray film.

\* \* \*

"A. * * * That's the way he obtained it in the first place, repeated exposure over a period of years, and even if it was only a few days he would add something to his condition."

Dr. Swindell examined appellant in November and December, 1941, both examinations disclosing practically the same condition except that the latter examination showed a slight increase in blood pressure. He testified that he found no symptoms of active tuberculosis; that appellant's condition was very good as far as his heart was concerned, no heart involvement, blood pressure normal, did not cough except during examination when requested to do so.

█ The above evidence, as well as other testimony in the record upon this point, constitutes substantial, competent evidence to support the board's finding "that the work the claimant did for defendant did not cause the silicosis from which he is now suffering and did not cause or light up, or aggravate tuberculosis." It is clearly established that the claimant was afflicted with chronic silicosis at the time he entered respondent's employment; that he had also been afflicted with tuberculosis, but there is no evidence in the record that the tuberculosis from which he was suffering was caused, aggravated, or lighted up by reason of his employment. The evidence negatives the contention that his employment lighted up or aggravated his tuberculosis and was a contributory cause of any accident resulting in injury alleged to have been sustained.

█ We come now to the question of whether or not appellant's employment in the mine precipitated, aggravated or lighted up his silicotic condition by inhaling of silica laden dust. The board found that the work appellant did for respondent did not aggravate the silicosis more than any other work would have done, if it aggravated it at all.

Dr. Albert B. Boeck, among other things, testified that he recently made a physical examination of appellant, and that he had chronic silicosis, grade 2. The following hypothetical question was propounded to the witness:

"Q. * * * assuming that this Mr. Bert Benson, whom you examined, went up to the Hayfork Mine in Boise County, and was employed there by Mr. Hal R. Jarvis for a period of approximately sixty to sixty-three and one-half days, and during that time, or during the greater portion of that time, did work in that mine using a—drilling with a hand

drill and doing some mucking and, assuming further that that employment lasted * * * for a total period of some sixty to sixty-three and one-half days, assuming further, Doctor, that the dust concentration in that mine and in the places where Mr. Benson worked ran from two million particles per cubic foot of air up to 4.4 million particles of dust per cubic foot of air, in your opinion—would Mr. Benson have incurred this condition of silicosis during that period of employment and resulting from that employment. * * *

"A. I would say no. * * *.
* * *

"Q. Further, Doctor, assuming those same conditions as related, would this condition of silicosis, in your opinion, have been aggravated by this employment for this length of time.

"A. No.
* * *

"Q. Have you been up at the Hayfork Mine?

"A. Yes.

"Q. Have you been in the workings up there?

"A. Yes.

"Q. Doctor, isn't the matter of contracting silicosis a question of a considerable period of time, isn't that true?

"A. Yes, the period of time depends upon the exposure and the concentration of dust.
* * *

"Q. Now when you were up there, and were in the workings of this mine, did you notice what the air conditions were, Doctor?

"A. Yes.

"Q. State what they were.
* * *

"A. I have to go by there all the time. I would say he has very good ventilation.
* * *

"Q. You made the casual statement did you not, at the time you were examining him, after you checked his breathing to the effect that he hadn't ought to be making any runs for the busses or anything of that kind?

"A. Yes. Do you know why? He definitely stated to me he had felt badly all summer long and that he took time off from his work because he didn't feel good.

"Q. He told you that was while he was working at the mine?

"A. While he was at the office.

"Q. Yes, referring to the work at the mine?

"A. While he was working.

"Q. And he told you he got ill while working and quit?

"A. No, he didn't admit he quit, he stated he was feeling badly, didn't state any definite period when the illness started. Stated he was off and on work all summer.

"Q. To refresh your memory, isn't it a fact he didn't say anything about being ill prior to the time he went to work at the mine?

"A. No, Sir.

"Q. Could you be mistaken?

"A. I could as well as you could. I don't remember——he told me when he was working he didn't feel good, that is definite.

"Q. He told you he had been working in the Hayfork Mine, that's what you understood?

"A. Yes, the Hayfork workings there.

"Q. He was speaking of that period of time?

"A. While he was working there, yes.

"Q. Just a little misunderstanding which has been cleared up?

"A. Yes.

　　* * *

"Q. Doctor, have you examined the ore that was removed at different times from this mine by Mr. Jarvis?

"A. Yes.

"Q. State the nature of it, with reference to moisture.

"A. It is a more or less a talc mixed with rock and I have gone by this mine on an average of once a week, and I would say that I possibly have examined twenty or thirty specimens of this. Merely interested to see what the nature of it was and the conditions, and I picked it up——I have grabbed a handful out of there many different times. It is

a moist dirt, it is so moist you can pick it up in your fist and it will remain in a ball—that is the ore from the mine."

H. C. Clare, engineer, Director of the Division or Bureau of Industrial Hygiene, Department of Public Health of the State of Idaho, among other things, testified that "in a case where free silica is a great deal more than 10% * * * it is possible that ten million particles per cubic foot of air is dangerous, or hazardous or injurious. In that case, we would say that concentration of more than five million particles would be hazardous or injurious or dangerous;" and "We believe that the ten million particles as set up in these rules [Idaho Rules and Regulations Relating to the Control of Silica Dust] and regulations are a reasonable and safe limit for workmen to work in metal mines—gold and quartz—or "hard rock mines in Idaho."

"Q. Mr. Clare, I will ask you further to state if in your opinion, if that dust concentration was less than five million particles per cubic foot, that would constitute an injurious exposure?
 * * *

"A. No, I would say that the dust exposure of less than five million particles in any concentration of free silica would not be injurious."

Joe H. Latimore, a graduate of the University of Idaho in mining, employed by the Idaho State Health Department in the Division of Industrial Hygiene, devoted a part of his work to testing air conditions in mines for the purpose of determining dust content. He testified that he examined the Hayfork Mine on November 12, 1941, and made the following answers to the following questions:

"Q. Mr. Latimore, when you were up there, did you go through the tunnels as shown on the diagram?

"A. I was through all but one shown on the diagram. I only went through part of that one.
 * * *

"Q. And in those workings, any place you walked did you notice any especially foul air?

"A. I did not.

"Q. Where you went and made your tests, did you notice there was somewhat of an air current there, Mr. Latimore?

"A. Yes, there was.

"Q. Now, you have made a considerable study of the dust hazard in the mine, have you, Mr. Latimore?

"A. Yes.

"Q. And you have studied different authorities that have written books on it?

"A. I have studied a number of them.

"Q. Besides your own personal observation of those conditions in the mine you tested?

"A. Yes.

"Q. From that observation, did you see any place in that mine that you would have considered it poor precaution not to have artificial ventilation?

"A. Based on the results of this study, indications are that when the study was made, the dust samples were below the regulations adopted by the board. [Board regulations, maximum safe dust concentration . . . ten million particles per cubic foot of air. Dust concentration in Hayfork Mine varied from two to four and four-tenths million particles per cubic foot of air.]

"Q. And did you notice what was, was there any dampness in those places, any moisture in the air or on the ground?

"A. Moisture such as anyone would expect in the underground tunnel or shaft.

"Q. Did you notice moisture?

"A. Yes."

Martin Stein, who had been engaged in mining in the Boise Basin district for the last 15 years, and had had considerable experience in working quartz mines, and had worked in the Hayfork Mine about four years prior to this action, having run a long "tunnel clear through on contract," testified as follows:

"Q. Will you state what the air conditions were in there, to the board, from your observations in that mine?

"A. After we broke through, we had excellent air. The air was rather foul on going in.

"Q. The long tunnel?

"A. The long tunnel. The air wasn't bad in the raise until we broke through and, of course, there was large drafts of air from then on. You could shoot and take the smoke out like a smoke stack.

"Q. That condition prevailed through the mine after the tunnels were open.

"A. Yes.

"Q. In your experience, Mr. Stein, as a miner, and in your opinion in the event of running a short drift approximately fifteen feet from a raise similar to this raise shown running from tunnel "X" to tunnel "Z", in your opinion, would there be any foul air in a tunnel of that length or a drift of that length?

"A. It would be impossible.

"Q. Assuming that it was even thirty or thirty-five feet in length, would there be any foul air in there?

"A. Your draft would continue the air circulation in a short drift.

"Q. Within your experience you know that is true?

"A. I know that is true.

"Q. In your opinion and from your experience as a miner and working in different quartz mines and underground workings, would the air in a tunnel approximately twenty-five feet from the air vent, would the air in the end of that tunnel be bad or would it be a dead air?

"A. Hardly—twenty-five feet would be just about—that would just about put you on sun light, practically on the face.

\* \* \*

"Q. Mr. Stein, in your opinion, in stoping off of the tunnel marked "Z", did you find any bad air in any of those stopes?

"A. No, the tunnel was open at both ends, there was a regular draft through there, and it would easily carry that away.

"Q. Did you ever find any place in there that you considered the air was in such a condition it was dangerous or injurious to you?

\* \* \*

"A. Not after the lower tunnel and the raise was completed, no chance for dead air. It was too short a piece of ground and such an air current."

Respondent Jarvis, a graduate engineer, testified that he had been working in this mine since 1913, and made the following answers to the following questions:

"Q. Relative to moisture conditions this year, Mr. Jarvis, what were they in that vicinity?

"A. Everything was wet, I should say it was wet. The face of the ground was full of fissures from the upper cave and the water had no other place to go except through the tunnels.

"Q. During all of this year, did those wet conditions prevail up there, Mr. Jarvis?

"A. In my main tunnel it is most always damp, but after it has laid for several months it gets dry.

"Q. Was it wetter than usual up there this year?

"A. Yes, sir.

"Q. And you were in all of the places that Mr. Benson worked in up there during the time he was at the Hayfork?

"A. I worked along with him right along, except a few days.

"Q. What were the conditions relative to dryness, relative to the workings where Mr. Benson was?

"A. We had moisture—it wasn't dripping but it wasn't dry.

"Q. It was not dry?

"A. No dry rock in there at all.

"Q. Did that prevail at every point where Mr. Benson worked?

"A. Yes, it got wet on the lower levels.

"Q. Were you there when he was doing his hand drilling in all of these places, Mr. Jarvis?

"A. He was hand drilling—I was hand drilling along with him part of the time.

"Q. Now, tell us what you observed relative to the dust conditions in the air.

"A. I never paid any attention to it, there wasn't any dust, there couldn't be, in a moist condition.

\* \* \*

"Q. With reference to air conditions in there, will you explain what they were?

"A. Drafty.

"Q. And did that condition prevail throughout the time that Mr. Benson worked in that stope?

"A. Yes.

\* \* \*

"Q. State what the condition of the ore and ground was in there [another portion of mine] at that time with reference to moisture.

"A. Just wet enough to see water running down the foot wall very slightly.

"Q. State what the condition was with reference to the air in that drift, Mr. Jarvis.

"A. An appreciable current of air.

"Q. Did you notice any place in either of these places where Mr. Benson worked that there was foul or ·dead air?

"A. No.

\* \* \*

"Q. Describe the condition of the ground and the rock where Mr. Benson was drilling with reference to moisture. [Having reference to still a different portion of mine.]

"A. It was extremely moist. I might say there was no quartz in that drift—it was all talc.

\* \* \*

"Q. What was the condition in that drift with reference to air circulation, Mr. Jarvis?

"A. The point was approximately thirty-five feet from the raise where the circulation of air was good.

\* \* \*

"Q. Did you notice anything in there?

"A. I didn't notice any badness of the air. It was pretty wet. That was the lowest and the lower the—the lower you get the wetter it is.

"Q. That was the last place Mr. Benson worked for you?

"A. For about six days.

\* \* \*

"Q. Now, with reference to the condition at that time [i.e., when tests were made] so far as dust was concerned, comparing them with the conditions when Mr. Benson was working in those places.

\* \* \*

"A. Of course this was not—we stopped for a month or five weeks so it was considerably drier than when the operations were taking place."

We have not incorporated all of the evidence introduced upon the hearing before the board. To do so would extend this opinion unreasonably. We have, however, pointed out sufficient, competent and substantial evidence to support the board's findings, ruling of law, and order. Questions other than the one here decided are raised in the briefs of the litigants and ably discussed. However, we do not feel they need be decided in view of the fact that the board definitely found that appellant did not contract silicosis, nor was it aggravated, during his employment by respondent, which finding being supported by substantial, competent evidence will not be disturbed on appeal.

The order of the board denying compensation and dismissing appellant's application is affirmed. Costs to respondent.

Givens, C. J., and Morgan, Holden and Ailshie, J.J., concur.