(No. 7038. September 25, 1942.)

ANNETTE WADE, Appellant, v. PACIFIC COAST ELEVATOR COMPANY, Employer, and TRAVELERS INDEMNITY COMPANY, Surety, Respondents.

[129 Pac. (2d) 894.]

Rehearing denied October 26, 1942.

Jones, Pomeroy & Jones and Chas. T. Cotant for appellant.

Merrill & Merrill for respondents.

AILSHIE, J.—John Franklin Wade commenced working for the Pacific Coast Elevator Company (respondent) as a seasonal employee, in August, 1938. Between June and

September, 1941, Wade was regularly employed by respondent, working ten hours a day, beginning at 7 o'clock in the morning. He was the mill or elevator foreman of the company,

"and his job was to see that the men who were working for us [company] did their work properly and that the wheat went into the proper bins, that the trucks were weighed correctly, that the wheat was properly graded on the testing scales and make out the scale tags, and keep a copy and one for the elevator, direct where the sacks of wheat should be piled outside, if necessary, and which bin the wheat should go into, and generally see that the work was properly conducted . . . . He would help unload a load of wheat once in a while—it was part of his job."

In order to inspect the bins, where the wheat was being stored, Wade climbed a 47-foot vertical ladder "Sometimes once or twice a day and sometimes three or four times."

September 2d, 3d, and 4th, 1941, Wade was not feeling well and asked for leave to remain at home. He was not in bed and did not call a doctor. The manager of the company, who visited him at his home, testified that Wade "had felt that way before and in two or three days it passed off and he was all right again." He had told the manager that "about the middle portion of his back was where he seemed to ache and pain the most." He had complained to his wife "of the heat and the dust."

September 5, 1941, Wade went back to work, and "seemed to be fine", his wife said. The manager of the company and one of the employees working at the elevator, said Wade "looked all right" that day. In the afternoon, about 3:30, he helped one of the men unload between 60 and 70 sacks of wheat, each one averaging from 135 to 150 pounds. After piling up the grain, the two men "sat down on the grain pile and rested up a little bit." Wade then climbed the ladder to the elevator, "to check the bins to see how much room he had", and "called for the grain to be elevated up"; and "to shoot it up full".

The testimony indicates that "possibly half or two-thirds of a truck load" of grain was elevated. Evidently Wade "must have been shoveling grain, or trying to make room", as he had told Littlefield, the other employee, "he was going up to make some room". In five or six minutes

the grain "back-legged and ran over." Littlefield called up to Wade but received no answer. After the machinery was stopped, Mr. Meadows, the manager, climbed the ladder and found Wade lying in the bin "as if he had laid down or fallen over or something of the sort . . . . The shovel was standing straight up in the wheat a short distance, a foot or two from his feet." Mr. Meadows rubbed Wade's face and hands and felt his pulse but could find no sign of life. A physician (Farrell of American Falls) was called and pronounced him dead. Dr. Farrell testified in part as follows:

". . . . I wired the State Insurance Fund that a man was found dead and that the cause of the death was unknown . . . . It seems they wanted to know the cause of the death and I didn't know. He apparently hadn't suffered any injury that I could detect, . . . . The brain was removed and I still found no cause for his death, . . . .

"Q. As to the cause of the death of the decedent, Wade? . . . . Have you an opinion?

"A. Yes.

"Q. State what your opinion is. . . . .

"A. Accepting Dr. Howard's opinion from his microscopic examination that he had a coronary thrombosis, then I have an opinion as to what caused his death . . . . I accept as true that the microscopic examination made by Dr. Howard reveals thrombosis in the arteries as related . . . . If I were to read his report without his conclusions, I could know he had coronary thrombosis . . . . I think he died of coronary thrombosis.

"Q. Have you an opinion, Doctor, whether or not the type of work that he was doing as described in the hypothetical question immediately preceding his death accelerated or aggravated the condition of his heart? . . . .

"A. My opinion is that, provided he had coronary thrombosis and that he did the type of work as set forth, it would have some effect upon his death . . . . An examination of the chest and abdomen revealed no cause for his death —that is no objective cause of his death. I made a gross examination of the arteries, the heart, the lungs and kidneys, the stomach and other organs of the abdomen and found no cause for his death . . . . I still was unable to determine why he died after I did the autopsy . . . . We don't know when death is coming in coronary thrombosis, it may be

the next thirty minutes and it may be the next two years, regardless of whether they exercise or don't exercise . . . . It would appear that *he wasn't suffering at the moment from cardiac distress from climbing the ladder."* (Italics supplied.)

Dr. Howard, a graduate of Johns Hopkins Medical School, who never saw the body but made an examination of certain portions thereof, testified:

"These organs, the heart and brain were examined by myself in considerable detail, both grossly and microscopically . . . . the brain was completely normal to microscopic and gross appearance . . . . No abnormalities were found in the kidney or the spleen or the lung. The only abnormality of any great consequence which I found were in the blood vessels of the heart. The heart was not enlarged . . . . The heart muscle appeared fairly normal. No great amount of scarring of the heart muscles. The valves of the heart were completely normal . . . . Both right and left coronary arteries showed considerable hardening of the arteries, arterio-schlerosis . . . .

"Q. Would that indicate the heart was in a damaged condition?

"A. Well, it indicates the heart has an inadequate circulation.

"Q. And according to this report, you stated it showed that those occluded areas, organized thrombi, or blood clots had existed for a period of about six weeks to six months?

"A. Certainly at least six weeks and perhaps several months. . . .

"Q. Is that what is commonly called coronary thrombosis?

"A. Yes, that's coronary thrombosis . . . . If it occurs on both sides, as it did in this gentleman, it is certainly an extremely serious condition . . . . A man of this type with continuous violent exercise over a period of months or weeks could not help but hasten his death—on the other hand, violent exercise at any one given time for a relatively short period of time, several minutes, would not necessarily hasten or be productive of his death; if he did not continue in that violent exercise regularly over a period of time . . . . It would be very improbable for life to have lasted long.

"Q. And such that he may have died under any circumstances at any time?

"A. That is true . . . .

"Q. With the condition you found, would his death be hastened by any violent exercise?

"A. It would be possible for violent exercise to initiate his death some time, that is, any given time . . . . There is several ways one might answer it. There is one of the prominent heart specialists back in New York that made a study of this identical question several years ago—about two years ago, in particular relation to the number. of these cases that die suddenly following a severe physical strain, and he found that the greatest percentage of these people—among the group that he studied—the greatest percent died while they were more or less inactive, and they might be just sitting around, maybe sitting around that night after they had eaten their supper some might have have died as Mr. Merrill said, died during sleep—the greatest percentage died while they 'were inactive. Those particular men concluded from that, *that physical exertion had no bearing whatsoever on death from this type of illness, but I don't think most doctors agree with them on that point.*

"Q. Do you agree with them on that point?

"A. No. But from the standpoint of frequency of death, I think that every doctor would have to agree *their figures are correct,* most of the people die, not under extreme exertion, but the figures are probably misinterpreted I figure—I don't believe they are interpreted in the proper way." (Italics inserted.)

Dr. Roberts, practicing physician at Pocatello for thirty years, testified:

"Q. Now Doctor, you have been in the room during all of this time and heard Dr. Howard's testimony, I believe?

"A. Yes, I have . . . .

"Q. What, in your opinion, from that testimony was the cause of the death of Mr. Wade?

"A. Coronary embolism . . . . Clotting of a blood vessel.

"Q. What is your opinion as to whether or not that was a sudden condition of the man, or a matter of some standing?

"A. You mean. the coronary disease?

"Q. Yes.

"A. Some standing.

"Q. And what would you think as to the time?

"A. Months or years.

"Q. Now, Doctor, what would, a man in that condition, what would cause sudden death with that physical condition of his heart?

"A. Anything . . . . He might have died sleeping, or walking, or he might have died doing strenuous exercise, maybe running after a train, something like that . . . . He could have passed out of the picture any time with that finding . . . .

"Q. Well, climbing a ladder forty-seven feet high, a man of 195 pounds in weight, and lifting sacks fifteen or twenty minutes before, weighing 135 or 150 pounds, before shoveling wheat with a shovel in the elevator—what would you say the possibility is of such a condition aggravating the diseased condition of the heart such as this man had? . . . .

"A. *It is a possibility, not a probability.*" (Italics inserted.)

Perhaps, as elucidative a statement as was made by any of the witnesses, concerning the cause of death, was by Dr. Roberts as follows:

"Q. What, Doctor, in your opinion was the predisposing cause of the death of Mr. Wade?

"A. This coronary disease.

"Q. Was that an accident—was that a sudden or an accumulating disease developing within the man? . . . .

"A. I would say it was a condition of long standing.

"Q. Would you say it was a condition resulting from an unlooked for mishap, or untoward event happening suddenly or otherwise?

"A. Otherwise.

"Q. By otherwise, you would mean what?

"A. *A series of events of long standing.*

"Q. *And from within the man?*

"A. *Yes.*" (Italics inserted.)

Dr. Groom, practicing physician at Pocatello, testified:

"Q. . . . . I will ask you if you have an opinion as to the cause of the death of that person who was Wade in this case . . . .

"A. Yes . . . . my opinion is that the man died of acute coronary embolism. . . .

"Q. You may state, then whether, taking into consideration all those facts that have been stated to you, whether the work that he did, the exercise, the strenuous exercise he took aggravated and accelerated his death? . . . .

"A. Yes, it did . . . .

"Q. That the death in the elevator might have been a mere coincidence?

"A. It might have been.

"Q. And furthermore, Doctor, the manner in which he might have ascended the stair would have a bearing upon your conclusion, would it not?

"A. Yes.

"Q. And you would not be prepared to say the climbing of the ladder accelerated the condition?

"A. I think climbing the ladder would accelerate the heart whether he climbed it fast or slow."

 Death is not in itself an accident, within the statutory definition of "accident" (sec. 1, chap. 161, 1939 Sess. Laws) ; though often the result of accident. (*Maas v. Otis Elevator Co.,* 140 Pa. Super. 33, 12 Atl. (2d) 814; *State ex rel Hussmann-Ligonier Co. v. Hughes,* 348 Mo. Rep. 319, 153 S.W. (2d) 40, 42; *Stanton v. Minneapolis St. Ry. Co.,* 195 Minn. 457, 263 N.W. 433.) Employers' liability compensation is not meant or intended as life or health insurance; it is purely accident and occupational disease insurance.

 All the evidence there is, as to the cause of death, is the opinion evidence of the physicians above named, only one (Dr. Ferrell) of whom saw the deceased workman, and that was after his death. The burden of proof was on the claimant to prove that the death of the workman was the result of an accident. (*Rand v. Lafferty Trans. Co.,* 60 Ida. 507, 514, 92 Pac. (2d) 786; *Brooke v. Nolan,* 59 Ida. 759, 761, 87 Pac. (2d) 470, and cases therein cited.) That burden was, in the opinion of the board, not sustained. On the contrary, the board found:

"That John Franklin Wade on September 5, 1941 died of coronary embolism and that no unexpected, undesigned, and unlooked for mishap or untoward event, happening suddenly and connected with the industry in which the

claimant was working on the said 5th day of September, 1941 and causing an injury resulting in violence to the physical structure of his body happened to the said John Franklin Wade on the said 5th day of September."

The board may have followed the ruling of this court in *Stroscheim v. Shay*, 63 Ida. 360, 120 Pac. (2d) 267; *Nistad v. Winton Lumber Co.*, 61 Ida. 1, 99 Pac. (2d) 52, and cases therein cited, holding that the triers of fact are the final judges of the weight and credence to be given the *opinions of experts hypothetically stated.* Since the amendment of art. V, sec. 9, of the constitution (1937 Sess. Laws, p. 498), we have uniformly and consistently held that this court, on appeal in industrial accident cases, is limited to review of questions of law only. (*Knight v. Youngkin*, 61 Ida. 612 at 621, 105 Pac. (2d) 456, and cases therein cited.)

We do not think this case falls within the class of cases where a pre-existing injury, disease or ailment is suddenly accelerated by accident; or an extraordinary or unusual circumstance happens in the course of the employment; and, therefore, the case is not ruled by *Aranguena v. Triumph Min. Co.*, 63 Ida. 769, 126 Pac. (2d) 17; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605; In re Larson, 48 Ida. 136, 279 Pac. 1087, and that line of cases.

The Aranguena case, while very similar to the one now under consideration, differs in a measure from this, in that a previous injury had occurred and affirmative facts were stated in that case by physicians and a heart specialist which do not appear affirmatively in the present case; nor was the state of the embolism quite what it was stated to be in the present case. In other words, the state of affirmative proof was more clearly established there while lacking in this case. Here, the doctor, who performed the autopsy, said he did not know the cause of death except as he gathered from the report of Dr. Howard, who subsequently made both gross and microscopic tests of the heart, brain, kidneys, and other parts.

The board, after hearing all the evidence, concluded that decedent did not die as the result of an accident arising out of or occurring in the course of his employment; and evidently did not believe, or choose to adopt, the opinions of those experts who said it was *probable* or *possible* that death resulted from the exertions of the employee on the date of his death.

It follows, therefore, that the holding of the board should be affirmed, and it is so ordered.

Givens, C. J., and Budge, J., concur.

Morgan and Holden, JJ.

We dissent.

In re Larson, 48 Ida. 136, 279 Pac. 1087; *Fields v. Buffalo-Idaho Min. Co., Inc.*, 55 Ida. 212, 40 Pac. (2d) 114; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605, 97 A.L.R. 1399; In re Soran, 57 Ida. 483, 67 Pac. (2d) 906; *Cook v. Winget*, 60 Ida. 561, 94 Pac. (2d) 676; *Hieronymus v. Stone's Food Stores, Inc.*, 60 Ida. 727, 96 Pac. (2d) 435; *Nistad v. Winton Lumber Co.*, 61 Ida. 1, 99 Pac. (2d) 52; *Pinson v. Minidoka Highway District*, 61 Ida. 731, 106 Pac. (2d) 1020; *Aranguena v. Triumph Mining Co.*, (Ida.) 126 Pac. (2d) 17.