323 P.2d 1079

Anna D. LAIRD, Surviving Widow,
Claimant-Appellant,

v.

STATE HIGHWAY DEPARTMENT, Em-
ployer, and State Insurance Fund, Sure-
ty, Defendants-Respondents.

In the Matter of the Death of Edward
William Laird.

No. 8523.

Supreme Court of Idaho.

April 10, 1958.

V. K. Jeppesen, Dubois, Jeppesen & Jeppesen, Boise, for appellant.

**14**

Graydon W. Smith, Atty. Gen., Glenn A. Coughlan, Asst. Atty. Gen., for respondents.

SMITH, Justice.

August 25, 1955, Edward William Laird during his work suffered a coronary attack and consequent total heart failure causing his death on that date. Appellant, his widow, claims workmen's compensation death benefits contending that her husband's heart injury, resulting in his death, was caused by accident arising out of and in the course of his employment by respondent employer. Respondents denied liability on appellant's claim. The Industrial Accident Board after a hearing had, entered an order denying to appellant recovery of compensation. Appellant has perfected an appeal from such order.

Laird was employed as a traveling mechanic by respondent State Highway Department. About midafternoon, August 18, 1955, while driving a road roller on road work near Island Park, he suffered a heart attack. The driver of the pilot car took Laird to his pickup at the end of the pilot's car route where he took oxygen.

Laird returned to his home at Dubois the next day, Friday. The following Mon-

day, August 22nd, he consulted Dr. Rees in Idaho Falls, who examined him, and referred him to Dr. McMillin, also of Idaho Falls, for further examination including an electrocardiogram. Appellant testified that her husband hadn't felt so well through Monday and Tuesday, but when he arose Wednesday he felt fine and thought he would be going back to work. He stayed at Warm River that night.

The next day August 25th he reported back to work near Island Park. During the morning he repaired a car generator and a bumper. During the afternoon he worked about an hour, welding hinges on a steel plate over a distance of about six feet; the plate was "fairly heavy" about eight inches wide and six feet long; this plate constituted the lower portion of the metal rear gate of a mechanized road machine called a pulverizer. While the rear gate itself was raised hydraulically, its hinged, eight-inch lower plate was raised and lowered manually during the hinge welding operation.

Laird wore a welding mask covering his entire face, with his face within a foot or closer to the actual welding operation. The temperature was in the 90's. A fellow worker testified, "It was awfully sultry that day and hot." The altitude was over 6,000 feet. Laird was working in the sun. A fellow worker then related what occurred after the welding operation:

"A. After he got through with the welding he had to beat it out with a sledge hammer * * * about a two pound hammer.

* * * * * *

"Q. He was knocking the slag and sledge from it? A. Yes, and there was a little straightening on the rod, by the hinges.

"Q. He was trying to straighten that? A. Yes, he beat on that some."

After Laird had finished this job he sat in his pickup to rest where, in but a very short time, he had a heart attack. His co-workers gave him one of his nitro-glycerin tablets and administered oxygen to him from a welding machine. He was placed in a patrol car to be taken to Ashton; he expired en route about twenty minutes later

The only issue involved, as stated by the Board, is whether Laird "suffered personal injury by accident arising out of and in the course of his employment * * * which contributed to his death." Appellant's assignments of error question the sufficiency of the evidence to sustain the Board's order denying compensation. Since the evidence is not in conflict, examination of the facts thereby established and the law applicable thereto will determine whether the Board correctly decided the issue.

In a compensation case, the evidence, if undisputed may be reviewed as a matter of law to determine its sufficiency to sustain the findings of the Industrial Accident Board. If the Board's findings are clearly unsupported as a matter of law, it is within the province of this Court to set them aside and the decision based thereon. Ybaibarriaga v. Farmer, 39 Idaho 361, 228 P. 227; In re Hillhouse's Estate, 46 Idaho 730, 271 P. 459; Bybee v. Idaho Equity Exchange, 57 Idaho 396, 65 P.2d 730; In re Black, 58 Idaho 803, 80 P.2d 24; Paull v. Preston Theatres Corporation, 63 Idaho 594, 124 P.2d 562; Aranguena v. Triumph Min. Co., 63 Idaho 769, 126 P.2d 17; Benson v. Jarvis, 64 Idaho 107, 127 P.2d 784; Miller v. Bingham County, 79 Idaho 87, 310 P.2d 1089; Larson v. State, 79 Idaho 446, 320 P.2d 763.

This case is dependent largely upon the testimony of two medical experts, Dr. McMillin who testified for respondents, and Dr. Rees for appellant, both of whom were Laird's attending physicians. Admittedly an analysis of the case, because of its medical aspects, requires and is dependent upon knowledge, neither expected nor possessed by lay witnesses not trained in the field of medicine, and the basis for any award must rest upon and be supported by such testimony. Fackenthall v. Eggers Pole & Supply Co., 62 Idaho 46, 108 P.2d 300; Zipse v. Schmidt Bros., 66 Idaho 30, 154 P.2d 171; Walker v. Hogue, 67 Idaho 484, 185 P.2d 708; Oliver v. Potlatch Forests, 73 Idaho 45, 245 P.2d 775.

Appellant assigns error of the Board in finding that "He [Laird] was also ordered to quit work and rest," and that "Laird returned to work contrary to the recommendations of his doctor," as being not only contrary to, but unsupported by the evidence.

Dr. Rees, who examined Laird August 22, 1955, related Laird's symptomotology to a coronary condition. Dr. Rees thereupon referred Laird to Dr. McMillin for an electrocardiogram, to include testing the heart under strain and load.

Dr. McMillin then examined Laird in regard to past "episodes of tightness in his chest and pain which seemed to occur on exertion, possibly on walking for 100 yards on level ground, or walking up two flights of stairs, and that usually the pain was relieved by sitting down and resting. He didn't have any previous history of heart disease * * *." The doctor's examination included an electrocardiogram taken under stress and load. "Laird had coronary insufficiency, secondary to arteriosclerotic muscular disease."

Dr. McMillin's testimony, adduced on direct examination, regarding the permissive circumstances of Laird's return to work, is as follows:

"A. I suggested * * * that he stay off work for a period of time.

* * * but he said * * * he had to work and that his job was driving a road grader and that it wasn't terrifically strenuous; * * * he wouldn't have to exert himself too much, and that he would like to try that for a while and see if he could do it. That was the way we left it. * * *.

* * * * * *

"A. * * * We see people that have coronary pain on exertion that have had it for years and can go ahead doing moderate work and using medications and get along real well, * *."

and on cross-examination the doctor testified:

"A. * * * I told him if he had to work, I thought he should limit his exertion to things which would not produce pain, and apparently he had a fairly good idea of how much he could do and couldn't do, and it probably wouldn't be too injurious to him, * *.

"Q. He wasn't told he must not, under any conditions, do any kind of work was he? A. No, * * *."

Dr. Rees' testimony, on direct examination, permitting Laird's return to work, appears as follows:

"A. * * * He was told he should not do heavy work and had to take it easy. He informed us * * * he felt he could get along with a mild amount of exertion and wanted to continue to work, and we gave him permission to go ahead if he did not do heavy lifting, heavy work, heavy physical exertion."

Appellant's assignment is meritorious. The portions of the Board's findings to which appellant takes exception are unsupported by both medical experts,—one produced by appellant and one by respondents.

■ Appellant assigns error of the Board in "refusing to admit in evidence" Laird's death certificate. Counsel stipulated that the death certificate be sent to the Board and "marked for identification only." The certificate is shown marked only "for identification." It was neither offered nor introduced in evidence. Hence, regardless of the merits or demerits of the death certificate, it cannot be regarded as evidence in this proceeding; consequently no finding regarding it is permissible.

Appellant next asserts that the Board erred in ruling that "Claimant has failed by preponderance of the evidence to prove a personal injury by accident arising out of and in the course of decedent's employment and thus further failed to prove a causal connection between Laird's employment and his death." This and appellant's remaining assignments raise the question of the sufficiency of the evidence to sustain the Board's order denying compensation.

The Board made findings in accordance with the undisputed evidence in regard to the August 25th episode, reading:

"On the morning of August 25, 1955, Laird checked the generator on a patrol, repaired it, did some work on a station-wagon which had a lose bumper ·(f. 128). In the afternoon just prior to his final attack Laird was welding a steel door on a pulverizer, the job taking approximately one hour, the temperature was in the nineties and the elevation where Laird was working was approximately 6,000 feet (ff. 93 to 97). After he completed the welding he beat out the weld with a two pound sledge hammer. After this was finished he said he would like to rest a few minutes and went and sat in the pickup, his face started turning blue and he started gasping for air. He was given a nitroglycerin pill and oxygen from the welding tank was administered (ff. 98 to 101). Laird was then placed in a State Patrol car in order to take him to Ashton, Idaho. He expired about seven or eight miles after they left the scene of the welding."

Appellant points to the undisputed evidence adduced which supports such finding, and to the positive and uncontroverted medical evidence. Appellant contends that the evidence so considered shows:

That Laird in his employment was subjected to circumstances including overexertion and strain, which suddenly and unexpectedly accelerated his weakened heart condition thereby precipitating the heart failure with resultant death.

Appellant urges that in the light of the positive and uncontradicted evidence the Board committed error in failing to rule that Laird received personal injury caused by accident arising out of and in the course of employment.

The expert opinions of both physicians were elicited without objection bearing on the question of the *unexpectedness,* on Laird's part, of the heart attack. Dr. McMillin negatived any aspect of expectancy; in his opinion such an attack, while doing the work on August 25th, would constitute surprise to Laird. Dr. Rees was asked if it would follow for one suffering from heart disease to anticipate injury to his heart in advance of exertion; the doctor negatived any such anticipatory result by reason of *sudden occurrence* of symptoms of heart injury, such as chest pain, and because, when the symptoms show up, the damage is done.

Further, Dr. Rees, in his testimony referred to, recognized *injury* to the heart from the exertion as the causative factor; likewise so did Dr. McMillin, when he stated that "exertion of a more strenuous type would probably produce enough injury it could well cause his death." Dr. Rees testified additionally relative to the suddenness of the injury to Laird's heart as follows:

"Q. Ordinarily, does one of these coronary occlusions come on quite suddenly? A. Yes, very suddenly.

"Q. Do you think it did in this case? A. Yes.

\* \* \* \* \* \*

"Q. And the precipitating cause came on suddenly, didn't it?

"A. That is right, sudden shock, physical exertion beyond his capacity."

And the testimony of Dr. McMillin on cross-examination in that regard is as follows:

"Q. What would you say, Doctor, as to the suddenness under which these symptoms could produce the result in him—does that ordinarily take effect quickly when one exceeds that tolerance? A. Yes, it usually does— in a matter of a few minutes, or right while they are doing it, they begin having pain.

\* \* \* \* \* \*

"Q. \* \* \* do you think that came on him suddenly? \* \* \* a matter of your opinion, Doctor? A. Yes."

Dr. McMillin on direct examination was asked if Laird "had done some welding and had repaired a fuel pump, would you have an opinion as to whether that type of work could have any connection with his demise," to which the doctor answered:

"A. \* \* \* I would say, yes, his work probably—even though it was light—was too much. \* \* \* I think in view of what happened to him, in retrospect, undoubtedly it was something he shouldn't have been doing."

On cross-examination the doctor then was asked a hypothetical question setting forth the particular facts of Laird's welding the particular piece of steel on the piece of road equipment, and then using the two pound sledge hammer, as well as the facts detailing Laird's heart attack and demise. He then was asked, "Under those circumstances, Doctor, would you say that in your opinion the attack which brought on his death was precipitated by the work which he was then engaged in, the welding and using the hammer?" The doctor then testified:

"A. Very likely. The changes that we produced on this electrocardiogram were produced by much less exertion than that. What this amounts to, his walking up two eight-inch steps, \* \* \* and over the top and down— it is like a stile. \* \* \* around sixteen times in a minute and a half, and it produced these changes which we can see and it did cause him some pain, but which were not severe enough change, it just caused transient symptoms and subsided. Exertion of a more strenuous type would probably

produce enough injury it could well cause his death, yes.

\* \* \* \* \* \*

"Q. As to exertion, if the exertion engaged in would not exhaust the heart reserves it would not be particularly damaging to the heart disease, is that right? A. It is probably beneficial up to a point, until they begin having pain and shortness of breath.

\* \* \* \* \* \*

"Q. So that we couldn't say any exertion would be harmful to him could we? A. No.

\* \* \* \* \* \*

"Q. If at the time he was doing this welding and hammering work, it was an extremely hot day and high altitude, those two factors would have affected him adversely, wouldn't they? A. Yes.

"Q. Doctor, would this summarize your opinion as to the cause, would it be your opinion that his work immediately preceding his death aggravated or accelerated the previously diseased condition of his heart, precipitating the heart failure which caused his death? A. I think that would be reasonable to say that it probably did.

\* \* \* \* \* \*

"A. \* \* \* I think it is probable that his exertion did bring it on at that time, \* \* \*."

A hypothetical question was propounded to Dr. Rees. The question set forth the facts relating to the welding work and use of a two-pound sledge hammer which Laird performed the afternoon of August 25, 1955, including the altitude and temperature of the day. The doctor expressed his opinion that Laird died of a coronary occlusion or thrombosis, both of which have the same symptoms of heart attack. His testimony then appears:

"Q. Would you have an opinion as to what the probable cause, the proximate cause was that precipitated that attack? A. I think the precipitating factor was exertion beyond the capacity of his coronary arteries to carry the load. \* \* \*.

"Q. And assuming the facts as given you in the question could you point out anything there that would appear to be the proximate cause? A. Oh, surely, the hammering or bending over, or any excessive physical exertion could have been the precipitating factor at the time.

"Q. Do you think there was sufficient physical exertion in the question I gave you, and the facts assumed to precipitate it? A. Certainly.

"Q. And you think that exertion immediately preceding it was the precipitating factor? A. I certainly do.

\* \* \* \* \* \*

"A. * * * the heart muscle then is being robbed of the oxygen that the blood is carrying to it. * * *

* * * * * *

"Q. And in this case would the fact that the welder he was using at that time burned oxygen, with him being in close proximity to it, would that have any effect on his heart? A. Yes, I am sure it would. * * *

* * * * * *

"A. * * * we found he was unable to tolerate heavy physical exertion.

"Q. He was then in a rather serious condition at that time? A. No, if he had been serious, we would have hospitalized him and given him oxygen.

* * * * * *

"Q. The amount of work that he was doing there, taking a few strokes with a two-pound hammer, Doctor, would you consider that as extreme exertion? A. I consider it beyond his capacity."

The fact that Laird worked, though his health was impaired does not defeat compensation. This Court, in its first workmen's compensation decision, McNeil v. Panhandle Lumber Co., 34 Idaho 773, 203 P. 1068, ruled that the Workmen's Compensation Law makes no distinction between healthy and unhealthy or sound and unsound employees. Such has continued to be and presently is the law of this state. Miller v. Bingham County, 79 Idaho 87, 310 P.2d 1089, 1094; Lewis v. Department of Law Enforcement, 79 Idaho 40, 311 P.2d 976.

I.C. sec. 72–201 provides in part:

" 'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law.

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. * * *."

We shall analyze the episode involved in this case in the light of the requirements of the statute as applied to the facts developed by the undisputed evidence.

The statute is definitive of the event—the "accident"—as to certain of its outward aspects only, i. e., that it be sudden, unexpected, industrially connected, and causative of personal injury. The statute does not otherwise attempt definition of the "event."

Laird sustained a personal injury, i. e., the coronary attack, resulting in bodily damage; therefore the requirement of injury which results in violence to the physical structure of the body, is met.

Laird's injury was caused by an event, or stated conversely, an event resulted in his injury.

The event constituted the end result of stress and strain under the related circumstances,—the acceleration of the heart condition, which constituted the precipitating factor of the coronary injury.

The event happened suddenly.

The event is definitely located as to time when and place where it occurred, causing the injury.

The event was connected with the industry in that it occurred during the course of Laird's work.

The event was unexpected as to Laird and hence included within the purview of an unexpected, undesigned, and unlooked for mishap or untoward event as to him.

Briefly the record shows that Laird, with his existent afflicted heart, performed the work under conditions which from a medical standpoint, "affected him adversely," constituting factors precipitative of the coronary attack, with sufficient resultant injury to cause death. Those adverse factors were: First, Laird's close proximity to a welder burning oxygen; second, the high altitude,—over 6,000 feet, and third, the weather, which was "awfully sultry that day and hot." Particularly, the third factor standing undisputed, elicited from a workman performing his tasks in the near vicinity of Laird's work, indicated an unusual and adverse circumstance as to Laird, medically speaking, in the light of his afflicted heart.

Moreover the evidence is undisputed in the regard that the effect or end result of the event—the stress and strain—to which the record shows Laird was subjected, though perhaps to be considered not unusual to a worker with a healthy heart, was most unusual, untoward, unexpected and unforeseen as to Laird, by virtue of his afflicted heart.

This Court, In re Smith, 72 Idaho 8, 236 P.2d 87, 89, criticized the ruling of the Industrial Accident Board, that tipping of a tram car was an accident, and thereupon correctly analyzed the accident in the following language:

"Certainly the resulting heart strain under the circumstances [of the righting of the tram car] would be an unexpected, undesigned, and unlooked for mishap."

The legislature, in 1939, adopted the definition of "accident" as now appearing in I.C. sec. 72–201, as an amendment to the Workmen's Compensation Law. Sess. Laws 1939, c. 161, sec. 1. Prior to such

amendment the legislature had not attempted a definition. This Court in Pinson v. Minidoka Highway District, 61 Idaho 731, 739, 106 P.2d 1020, 1023, decided after the 1939 amendment, had this to say in regard to the definition of "accident" as now contained in the amendment, now I.C. sec. 72–201:

"The forepart of this definition includes nothing not essential to an accident under the earlier decisions of this court heretofore referred to. In other words, the definition of an 'accident' as defined by this court in former decisions was adopted by the legislature as its definition of an 'accident'."

■ This Court then pointed to matters which the amendment additionally required, being only, "that the mishap or event relied upon be definitely located as to time when and place where it occurred;" it also redefined "accident" in accordance with its previous announcements, in language as follows:

"To constitute an 'accident' it is not necessary that the workman slip or fall or that the machinery fail. An 'accident' occurs in doing what the workman habitually does if any unexpected, undesigned, unlooked-for or untoward event or mishap, connected with or growing out of the employment, takes place."

Citing in support of such definition, McNeil v. Panhandle Lumber Co., supra; Hieronymus v. Stone's Food Stores, Inc., 60 Idaho 727, 96 P.2d 435; Cook v. Winget, 60 Idaho 561, 94 P.2d 676; In re Larson, 48 Idaho 136, 279 P. 1087, and Aldrich v. Dole, 43 Idaho 30, 249 P. 87.

■ This Court in Lewis v. Department of Law Enforcement, 79 Idaho 40, 311 P.2d 976, also pointed out that such definition of accident, after the 1939 amendment, was applied and followed not only in Pinson v. Minidoka Highway District, supra, but also in Aranguena v. Triumph Mining Co., 63 Idaho 769, 126 P.2d 17; Cain v. C. C. Anderson Co., 64 Idaho 389, 133 P.2d 723; Teater v. Dairymen's Cooperative Creamery, 68 Idaho 152, 190 P.2d 687; Warlick v. Driscoll, 68 Idaho 552, 200 P.2d 1014, and In re Smith, supra; it also was applied and followed in Lewis v. Department of Law Enforcement, supra.

Lewis v. Department of Law Enforcement, supra, comprehensively reviews the opinions of this Court in workmen's compensation matters decided during the last thirty-five years, since McNeil v. Panhandle Lumber Co., supra, relating to the definition of "accident." It pointed to one case only, decided during that period of time which had failed to conform to the long unbroken line of decisions referred to therein. That case is Dunn v. Morrison-Knudsen

**24**

Co., 74 Idaho 210, 260 P.2d 398, a three to two decision. This Court in overruling that decision quoted from the dissenting opinion of the late Justice Thomas who, after exhaustively reviewing the outstanding Idaho cases, stated:

"It would appear that the decisions in this state until now have stood for the proposition that an accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of his health." [79 Idaho 48, 311 P.2d 980.]

And then ruled that the Dunn v. Morrison-Knudsen Co., case was "contrary to the many and consistent decisions of this court over a period of thirty-five years as to what constitutes an industrial accident. It would seem unwise to continue this departure from the many precedents."

The evidence in the case under consideration here shows that Laird met with an industrial accident which precipitated injury of such magnitude as to cause his death.

The order of the Industrial Accident Board denying compensation is reversed and the cause remanded with instructions to enter an award of compensation death benefits in favor of appellant to be determined by the Board. Costs to appellant.

PORTER and TAYLOR, JJ., concur.

KEETON, Chief Justice (dissenting).

I consider the above majority opinion in direct conflict with Art. V, Sec. 9, of the Constitution, and Sec. 72–608 I.C.; and Walters v. City of Weiser, 66 Idaho 615, 164 P.2d 593.

The case basically presents for determination the question: Is the death of a workman, who is afflicted with coronary insufficiency and arteriosclerotic muscular disease, doing the customary work for which he was employed, and who was advised by doctors who examined him three days before his death that his condition was serious, that he should not work for a period of time, continues on the job, suffers a heart attack which results in his death, compensable under the Workmen's Compensation Law, because of such alleged accident?

A workman, injured by accident, Sec. 72–201 I.C., and in case of his death resulting from accident, his widow or other dependents, Sec. 72–301 I.C., is entitled to compensation as specified in the act. Sec. 72–201 I.C. defines an accident as:

"'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place

where it occurred, causing an injury, as defined in this law."

and the terms "injury" and "personal injury", as

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. The said terms shall in no case be construed to include an occupational disease in any form and only such non-occupational diseases as result directly from an injury."

The evidence discloses that deceased had a diseased condition of the heart, arteriosclerotic muscular disease; that on the day of the heart attack and death, he was, before the attack, performing his customary duties. There was no heavy strain or lifting. Any type of muscular activity would likely bring about exactly what happened. The death, under the circumstances, cannot be said to be unexpected or accidental, and could, and probably would have occurred regardless of the work.

The holding that deceased met death due to an accident is to extend the Workmen's Compensation Law far beyond its terms. We should not attempt to escape from the legislative declaration limiting liability of the employer to accidental death, or injury by accident.

This Court has held that the Workmen's Compensation Act is not meant or intended as life or health insurance. Wade v. Pacific Coast Elevator Co., 64 Idaho 176, 129 P.2d 894; Swan v. Williamson, 74 Idaho 32, 257 P.2d 552.

In Walters v. City of Weiser, supra, an electrician who had a weak heart, continued to work, contracted influenza, attended a firemen's meeting and died of rheumatic heart disease complicated by influenza. Such death was held not to be accidental within the terms of the Workmen's Compensation Act.

In Swan v. Williamson, supra, the workman was found dead at his place of employment. This Court held that the suddenness of the death did not meet the terms of the Workmen's Compensation Act in the definition of what constituted an accident.

In the situation being considered the workman was stricken with a heart attack while sitting in a pickup motor vehicle near the place of his employment. He died shortly thereafter. The Board found that claimant had failed to prove an accidental injury or a causal connection between the death and the employment. This holding is correct.

Death is a termination of life. It may be caused by an accident but death on the job, or shortly after leaving the place of employment, without something more, is

**26**

not an accident within the terms of the Act.

Further, if the evidence were to be viewed in the light most favorable to the claimant, there is still no liability of the employer, However, there is a conflict in the evidence, and the Board's decision on such conflict should be final.

While it might be possible or probable that death resulted from overexertion, the Board's conclusion that such is not the case is binding on this Court. The finding of the Board should not be disturbed where there is any competent, substantial evidence to sustain such finding. The order appealed from should be affirmed.

McQUADE, Justice (dissenting).

Dr. John S. McMillin, the internist who made an examination and took an electrocardiogram of the deceased, Edward William Laird, with reference to the instructions given the deceased, testified as follows:

"A. I suggested to him that he take the medicine which I prescribed for him, and that he stay off work for a period of time. I don't recall now offhand how long, that would depend on what his symptoms were, we advised him not to do anything, but he said that he couldn't afford to do that; that he had to work and that his job was driving a road grader and that it wasn't terrifically strenuous; that he was sitting down and that the equipment—most of it—had power mechanism on it and that he wouldn't have to exert himself too much, and that he would like to try that for a while and see if he could do it. That was the way we left it. It was felt at the time he would be wise to just stop work entirely until his symptoms had subsided a little bit."

The exertion which produced the first attack was the operation of a hydraulically-powered highway roller. It must be observed there is little exertion required in the steering, operating, and controlling of this piece of equipment.

After the doctor's instructions, Edward William Laird returned to his employment and engaged in his normal occupation as a traveling mechanic. The work the deceased was performing which produced the injury that resulted in his death is characterized by the testimony of Grant Howard:

"Q. What kind of work was he going? A. He was doing some welding and hammering there.

"Q. Could you describe in detail what he did, his position and what work he did then? A. It is a pulverizer—what they use to pulverize the oil on the roads. It has a heavy door on the rear end with a plate on the back and

a kind of a smoother-outer, and it had come loose so he came down to weld the hinges together.

"Q. Is that quite heavy material he was working on? A. Well it is steel —it was fairly heavy, yes.

"Q. Did he have this equipment down on the ground when he was doing the welding? A. It was raised up two feet off the ground and he had to weld upward and sometimes from the top down.

"Q. Part of the time he was bending over and part of the time he was working upward? A. Yes.

"Q. Part of the time he was bending down and welding the top? A. Yes.

"Q. And that would require his face to be in quite close proximity to the welding machine, would it? A. Yes.

"Q. How far away would his face be from the actual place he was using the machine? A. Pretty close to it, as a rule—within a foot of it anyway, or a little closer.

"Q. He was wearing a mask over his eyes? A. Yes, he had a welder's helmet.

"Q. Does that completely cover his face? A. Yes, it is a hood that slips down over his face.

\* \* \* \* \* \*

"Q. Do you recall about how long it took for him to complete this weld-ing job? A. Yes, I would say he had been working on it approximately an hour.

"Q. And on finishing the actual welding, what did he do? A. After he got through with the welding he had to beat it out with a sledge hammer to a certain extent.

"Q. About how large a sledge hammer? A. About a two-pound hammer.

"Q. Did he use one hand or two hands? A. I never paid much attention, but I imagine one hand.

"Q. He was knocking the slag and sludge from it? A. Yes, and there was a little straightening on the rod by the hinges.

"Q. He was trying to straighten that? A. Yes, he beat on that some.

"Q. Would you describe what happened? A. After he finished that, he said he would like to rest a few minutes —I think I will sit in the pickup a while, and he went and sat in his pickup. He hadn't been there more than five minutes, I guess, until he took this heart attack."

All of the work performed by the deceased during the time of both attacks was under the same climatic conditions and at the same altitude.

Laird had been advised not to return to his employment, but when he insisted that

he had to work, his physicians cautioned him not to perform any work which would require strenuous physical exertion. Another of his examining physicians testified as follows:

"Q. The amount of work that he was doing there, taking a few strokes with a two-pound hammer, Doctor, would you consider that as extreme exertion? A. I consider it beyond his capacity."

It is clear that Laird suffered damage to his heart as a result of over-exertion in the course of his employment, and this has been held to be compensable. However, it is going beyond the conception of Workmen's Compensation that an award must be made to cover an *intentional* injury suffered as a result of a man's deliberate acts.

The courts of the several states have consistently applied liberal construction to the Workmen's Compensation statutes, which as a general rule require this common-sense interpretation; but the compensation statutes were never designed to compensate for deliberate, self-inflicted injuries. In Idaho this is governed by I.C. sec. 72–202:

"No compensation shall be allowed for an injury caused:

"By the employee's wilful intention to injure himself or to injure another * * *".

This Court has in numerous cases stated that Workmen's Compensation is not insurance, but the courts of many states have resorted to various legal stratagems to in effect accomplish the result of creating insurance. To enlarge the conception of Workmen's Compensation is a statutory matter, and should be left to the Legislature. Because our system of compensation has become an integrated part of the industrial structure, it would be realistic for the Legislature to so enlarge the statutes on Workmen's Compensation as to make it insurance.