(No. 6942. May 14, 1942)

CATHERINE R. SATER, surviving widow of John E. Sater, deceased, Appellant, v. HOME LUMBER & COAL COMPANY, Employer, and STATE INSURANCE FUND, Surety, Respondents.

(126 Pac. (2d) 810)

Rehearing denied June 24, 1942

George Donart and E. B. Smith, for Appellant.

Frank L. Benson, for Respondents.

HOLDEN, J.—August 9, 1940, and for about 12 years prior thereto John E. Sater was employed by the Home Lumber and Coal Company at Weiser, Idaho, as its assistant manager. It was his duty as assistant manager to solicit business and make collections, and for many years prior to that date Floyd Dillon and his wife Margaret Dillon resided at Weiser. In the years 1939 and 1940 the Dillons planned on building a home at Weiser. In the discharge of his duties, Assistant Manager Sater submitted plans and specifications for the contemplated residence and figured the costs of construction with the Dillons, and the Dillons actually excavated a cellar, but, on selling the lot, abandoned further construction. The Dillons did not, however, abandon the intention to build a home, and to that end Mrs. Dillon made new sketches and again and upon several occasions discussed the matter of the costs of building materials with Mr. Sater.

Saturday, August 3, 1940, the assistant manager, on full salary, accompanied by his wife, claimant herein, left Weiser by automobile on a trip through Southeastern Idaho and Yellowstone Park. He stopped at Nampa, where he attempted the collection of a company account from a Mr. Carson. They also stopped at Boise where Mr. Sater stated he was going to "try to collect a bill" for the company. From Boise Sater drove to Castleford, arriving there Sunday, August 4, 1940, where they visited with relatives named Bryant. Upon leaving the Bryants the Saters requested Mrs. Bryant "should there come any mail here send it to Idaho Falls." From Castleford they drove through Burley, Pocatello, Idaho Falls and Yellowstone Park and then back as far as Idaho Falls.

Dillon, employed by the Fish and Game Department was ordered temporarily to Mackay for duty, and reported there August 7, 1940, Mrs. Dillon accompanying him, but intending to return to Weiser. A week or two before leaving Weiser the Dillons conferred with Mr. Sater about the construction of a residence and at about that time the Saters indicated to the Dillons their intention of taking the above mentioned trip, and that they intended to stop at Castleford. Just before leaving Weiser for Mackay, Mrs. Dillon ascertained the Saters had gone.

She thereupon wrote a letter to the Saters addressed in care of Mrs. Emery Bryant at Castleford, stating in effect that they, the Dillons, had decided to build at Weiser, and made inquiry concerning the figures and suggested that they (the Saters) come back through Mackay and see them (the Dillons). Mrs. Dillon told her husband she had written the Saters and that she expected they would come by and see them in Mackay. Mrs. Bryant forwarded Mrs. Dillon's letter to the Saters to Idaho Falls, which the Saters received upon their return to Idaho Falls from the Park. At Blackfoot Sater left the main highway to drive to Mackay for the purpose of seeing the Dillons. As the Saters were driving through Arco, Dillon, who had come down to Arco from Mackay the previous day, recognized the Sater car as it drove past, and got into his own car and overtook the Saters. Mr. Dillon testified that after the usual greetings were had:

"He (meaning Sater) told me he was going to Mackay * * * to see 'you folks' (meaning the Dillons) * * * then he asked me what we had decided on in our building plans, * * * I told him we still wanted to build in Weiser and that I had no intention of making my home in Mackay. * * * The house and the plans were again discussed. * * * I told him we had decided to build a smaller house and not quite as elaborately finished; that we wanted to cut down on the expense and he (meaning Sater) said 'I see where you are right and I can save you money on that deal.' "

During the course of the above conversation Dillon informed the Saters that his wife was in Mackay and that "I (Dillon) told them Mrs. Dillon would be at home in Weiser in the near future and what she did was O. K. to me (referring to the building of a house in Weiser at that time) * * * Mrs. Dillon would be home * * * back in Weiser * * * around two weeks * * * she was the boss on the building. * * * You go ahead and figure with her and whatever my wife does is all right with me."

Following the conversation between Dillon and the Saters, Sater, instead of driving on to Mackay as he had intended to do, took the shortest and most direct route to Weiser (which route took the Saters through the Craters of the Moon). The road was "under construc-

tion, loose gravel, grading and some detours." After the Saters had driven through the Craters of the Moon, and when they had reached a point about eight miles from Carey, a rear tire blew out causing the car to pass out of control and go down over an embankment. Mr. Sater sustained fatal injuries, dying shortly after the accident.

The accident and death of the assistant manager was duly reported. No agreement for compensation having been reached, the widow filed a claim for compensation November 4, 1940. Later, December 23, 1940, she filed an application for hearing, pursuant to which the matter was heard May 6, 1941. May 17, 1941, the Board found:

"That the accident heretofore described and which was received by the said John E. Sater, on the 9th day of August, 1940, did not arise out of and in the course of the deceased's employment with the defendant, Home Lumber and Coal Company."

The Board then entered an order "That the claim for compensation of Catherine R. Sater against the defendants, Home Lumber and Coal Company, employer, and State Insurance Fund, surety, be and the same hereby is denied and her application dismissed."

The appeal to this court is from that order.

The controlling question presented on this appeal is as to whether the accident in question arose out of and in the course of the employment of the assistant manager of respondent Home Lumber and Coal Company.

Respondents earnestly and forcefully urge that Sater turned off the main highway at Blackfoot for the purpose of visiting with the Dillons and then driving on through the Craters of the Moon, and not for the purpose of seeing the Dillons about the construction of a home at Weiser, and that even though Sater made the side trip to consult the Dillons on business for his company, that not having driven on to Mackay to see Mrs. Dillon, "the boss," Sater thereby abandoned the business feature of the side trip and for that, if for no other reason, appellant is not entitled to compensation. On the other hand, appellant contends that even though the side trip was made for the two-fold purpose of visiting the Dillons and seeing them on a matter of business for the company, she is still and nevertheless entitled to recover.

██ What is the evidence, then, on the question as to what induced Sater to turn off the main highway at Blackfoot? In substance and without any real conflict, it is:

That Mrs. Dillon wrote a letter to the Saters asking them to come back through Mackay; that the Saters got this letter at Idaho Falls on their way home from Yellowstone National Park; that "the letter was very brief, three or four lines, and its contents pertaining to the building or figuring of the Dillons on their lots in Weiser, building a home on their lots in Weiser"; that Dillon happened to see Sater as Sater was driving through Arco on his way to Mackay; that a conversation occurred between the Saters and Dillon; that Sater, in effect, told Dillon, he (Sater) was on his way to see them (the Dillons); that Sater asked Dillon "what we had decided on in our building plans"; that Dillon told him (Sater) that "we still wanted to build in Weiser and that I, (Dillon) had no intention of making my home in Mackay"; that "the house and the plans were again discussed"; that "I, (Dillon), told him (Sater) we had decided to build a smaller house and not quite as elaborately finished"; that "we wanted to cut down on the expense and he (Sater) said 'I see where you are right and I can save you money on that deal'"; that Dillon told Sater Mrs. Dillon would be back in Weiser in "around two weeks"; that "she (Mrs. Dillon) was the boss on the building * * * you go ahead and figure with her and whatever my wife does is all right with me."

To say to Sater that Mrs. Dillon was "the boss" and that whatever she did about "the building" was "all right" did not mean that Dillon was surrendering any and all right to a voice in the selection of building plans and cost of construction, in which Dillon would necessarily have and retain a keen, vital interest. To interpret Dillon's statement to mean his wife alone would decide upon the plans and specifications as well as the cost of construction, without consulting him, would be absolutely absurd. Of course, Dillon wanted Sater to confer with Mrs. Dillon about the matter. The experienced Sater must have known that before it would be possible to close

a deal for the lumber and material account, a conference with both husband and wife would be necessary. At any rate, Sater, as assistant manager, with authority in the premises as full and complete as that of the manager, had, in the performance of his duty to solicit business for his master, the right to determine whether it would be to the best interests of his master to continue on to Mackay or wait until Mrs. Dillon returned to Weiser. Moreover, that Sater had been soliciting the Dillon account for a long while and that he solicited this business only about two weeks before leaving Weiser and that he again solicited the account at Arco, must be conceded. In these circumstances, and at a time when the negotiations were moving toward a favorable conclusion, no man possessing reasonable and ordinary common sense would abandon further efforts to get the business. Solicitors are not so easily denied. And the conversation with Dillon having ended, it was necessary for Sater to get back on the main highway. It appears that on one of the roads to the main highway there was scenery—the Craters of the Moon. Now let us suppose the other route was also scenic. Then, no matter which road Sater took, if respondents' argument is sound, Sater would have been "sight seeing" and not on business for his master. Sater, it must be remembered was on full salary, hence, he could not remain idle in Arco. He owed a duty to his master, who was paying him for his time. In the performance of that duty, the conversation with Dillon having ended, he drove on.

Moreover, in *Wineland v. Taylor*, 59 Idaho 401, 406, 83 Pac. (2d) 988, this court has clearly announced the rule that "if the service of the master was a concurrent cause of the trip, which the servant was taking at the time of the accident, the master would be liable for compensation." To the same effect: *Re Christy*, 59 Idaho 58, 76, 81 Pac. (2d) 65; *Parker v. Twin Falls County*, 62 Idaho 291, 111 Pac. (2d) 865; *Stover v. Washington County*, 63 Ida. 145, 118 Pac. (2d) 63, 66.

We come now to a consideration of the report of the accident involved in this appeal made by respondent employer Home Lumber and Coal Company November 4,

1940. This report was made nearly three months after the accident occurred, giving the employer ample time to investigate. It was made in obedience to the requirements of Section 43-1801, I. C. A., and was incorporated in and made a part of the record on appeal and was duly certified by the acting secretary of the Industrial Accident Board May 28, 1941. The certificate reads that the "attached documents:

1 . . .
2. Employer's notice of death of employee
3 . . .
4 . . .
5 . . .
6 . . .
7 . . .
8 . . .
9 . . .
10 . . .
11 . . .
12 . . .

Comprise the full and complete record of the Industrial Accident Board in the above entitled matter."

The pertinent part of the report follows:

"Decedent was driving from Idaho Falls to Arco to see a man by name of Floyd Dillon for purpose of completing arrangements for sale to him of lumber and materials to build a house in Weiser. Was returning from this trip when tire blew out, causing automobile to overturn and breaking his neck. The trip was made for the sole purpose of procuring business for the Home Lumber & Coal Company."

Respondents insist this report cannot be considered because it was not offered and admitted in evidence at the hearing before the Board. On that question we quote the following from Schneider's Workmen's Compensation Law, Vol. 2, (2d ed.) p. 1774:

"The objection that the employer's report of the accident was not formally offered in evidence is not well taken. The employer was fully aware of the contents of this report. If any corrections thereof were deemed necessary, they should have been brought to the attention of

the commissioners upon the hearing. The proceedings before the commission are not to be hampered by useless formalities nor technicalities."

Michigan, like Idaho, has a statute requiring employers to report accidents. In *Reck v. Whittlesberger*, 148 N. W. 247-249, the Supreme Court of Michigan held (we quote from paragraph 5 of the syllabus which fairly reflects the decision of the court) "a report to the Industrial Accident Board by the employer, made before the death of the employee, and at a time when he had ample opportunity to investigate, and all sources of information were fresh and available, stating that the employee was injured by running a nail into his hand while throwing wood into a furnace, and a second report after the death stating that he was injured by scratching his hand on a nail, constitute *prima facie* evidence that the accident and injury occurred as reported. . . . " To the same effect *Stockley v. School Dist. No. 1, of Portage Tp.* (Sup. Ct. Mich.), 204 N. W. 715.

The order of the Board is reversed and the cause remanded with direction to make Findings and enter judgment in favor of appellant for the statutory compensation allowable. Costs awarded appellant.

Budge, J., and Winstead, D.J., concur.

Givens, C.J., and Ailshie, J. dissent.

Morgan, J., deeming himself to be disqualified, did not sit with the court at the hearing nor participate in the decision, and Winstead, D.J., was called to sit in his stead.