190 P.2d 687

**TEATER et al. v. DAIRYMEN'S COOPERATIVE CREAMERY OF BOISE VALLEY et al.**

**No. 7348.**

Supreme Court of Idaho.

Feb. 26, 1948.

Rehearing Denied March 24, 1948.

E. B. Smith, of Boise, for respondents.

Hugh N. Caldwell, of Caldwell, and Elam & Burke, of Boise, for appellant.

HOLDEN, Justice.

Chester Otis Teater died August 4, 1944, suddenly and unexpectedly. August 10, 1944, the manager of the creamery made out an "Employer's Notice of Death of Employee", filing the same with the Industrial Accident Board September 20, 1944. The notice showed the following: "Heart; increased effort and exertion in connection with loading truck caused coronary occlusion by thrombus. The coronary occlusion caused the death of decedent." August 3, 1945, claim for compensation was filed by the widow of decedent, as an individual and as guardian of the minor daughter. November 12, 1946, claimant filed a petition with the Board praying that a time and place be fixed for hearing claim for compensation. The parties having failed to reach an agreement regarding compensation, the Board set the hearing for December 5, 1946, giving the parties notice thereof. December 5, 1946, the matter was heard. January 2, 1947, findings of fact and rulings of law were made and filed in favor of defendants and respondents and against claimant, whereupon the Board entered thereon the following order: "Wherefore, it is ordered, and this does order that Edith Teater, individually and as guardian of the estate of Bonnie Louise Teater, a minor, take nothing by these proceedings, and that her claim for compensation benefits against the defendants, Dairymen's Cooperative Creamery of Boise Valley, employer, and Aetna Casualty and Surety Company, surety, and each of them, be and the same hereby is denied and her application dismissed."

January 9, 1947, claimant prosecuted an appeal to this court from that order.

The Board found, among other things, that Teater performed logging work during the summer of 1927, and thereafter for three years performed ranch work during winter seasons and general timber work during the summers; for several years pruned orchards and performed general work, including operating his own truck line for a period of about five years; May 5, 1942, Teater entered the employ of defendant and respondent, Dairymen's Cooperative Creamery, employer, and worked for the creamery from May 5, 1942, to and including July 8, 1944; from July 9, 1944, to and including August 2, 1944, Teater was under a doctor's care, returning to work on the morning of August 3, 1944, and on that date, performed his regular work. Teater's regular work was that of a cream hauler, consisting mainly of obtaining merchandise invoices at his employer's office mornings, filling the invoices which consisted of butter to be delivered to patrons and ice cream to merchants, the butter being packed in packages weighing not over 30 pounds each, and the ice cream generally

in 5-gallon packers weighing 60 to 80 pounds each, and occasionally in 20-gallon packers weighing upwards to 150 pounds each; Teater had assigned to him two cream routes, each of which he covered on alternate days, a distance of 60 to 80 miles; he would drive to the patrons' residences or farms on each route, pick up the cream theretofore placed in 10-gallon cream cans, empty it from other containers into the cream cans, then weigh the cream, take samples and load each can of cream by taking hold of the handles and boosting it upward with his knee to an upright position on the floor of the truck, always loading from the back end of the truck and pushing the can forward, an empty can, or cans, left with patron, having already been removed from the front end of a row of cream cans; he would also deliver butter to patrons and butter and ice cream to the merchants in the towns through which he traveled.

Teater would arrive back at the creamery about noon of each day, unload his truck-load of cream by lifting the full cans of cream some six or eight inches to an endless belt which carried the cans of cream on a downward incline into the creamery, sometimes assisting in washing cream cans and always reloaded his truck with empty cream cans and then drove his truck to the creamery four blocks away and service the truck.

Teater always loaded his cream truck the previous afternoon with 35 to 38 empty 10-gallon cream cans, each about 24 inches in height and weighing 100-110 pounds when full; the floor of the cream truck was 44 inches from the ground and had a deck immediately back of the truck's cab, the floor of which was about six to eight inches higher than the top of the cream cans loaded onto the floor of the truck which included the area beneath the truck's deck; the floor of the truck deck being 74-76 inches from the ground.

During the morning of July 8, 1944, Teator worked as usual in covering one of the assigned cream routes and gathered a truckload of cream but did not unload his truck that day; after he came in from his route, he stopped at the home of Robert W. Welsh, the employer's route supervisor, telling him that he was not feeling very well, wanted some time off and was going to see a doctor, stating he had become choked up, had a pain and patted his chest; Teater did not look well to the route supervisor and the route supervisor at that time arranged that Teater might have time off; during the next day, July 9, 1944, a physician and surgeon was called to Teater's home and found Teater suffering from pain in his chest, bending over a chair, perspiring, in shock, and holding his chest; such physician diagnosed Teater to be suffering from a coronary thrombosis, administered morphine and nitro-glycerin and directed that he, the doctor, be kept advised of Teater's condition, especially if Teater didn't get better; on or about July 15, 1944, Teater

went to the office of such physician and, in so doing, climbed a flight of stairs but appeared somewhat improved; the physician advised Teater to stay home and in bed; July 22, 1944, Teater again went to the office of his physician, appeared to have lost some weight, but still more improved and told his doctor he wanted to go back to work, had been working a little around his acreage, had dug some post holes, and that such work hadn't hurt him, was suffering only a little pain; his physician advised him to stay at home, not do any tasks such as he had related.

Proper treatment of the aforesaid heart affliction required Teater to lead a sedentary life for three or four weeks and not exert himself by performance of work for a period of two months or more thereafter; July 28, 1944, employer's route supervisor visited Teater at his home; Teater appeared weak; July 29, 1944, Teater went to the employer's plant, told the employer's route supervisor he had been to see his doctor who "wasn't crazy about him returning to work"; that he wanted to return to work and indicated that he was feeling good; the employer's route supervisor thereupon made arrangements for Teater to return to work August 3, 1944, which Teater did. During the time intervening between July 15th and the end of July, 1944, Teater took two fishing trips, driving his own automobile; one of which trips being of a week's duration and the other of some three days duration. Prior to 7 o'clock in the morning of August 4, 1944, Teater drove his own automobile about eight miles from his home to his employer's garage, got his cream truck and drove it about four blocks to the Albany Street entrance of his employer in Caldwell and parked his truck about 64 feet away from where the ice cream was stored in the cold room; thereupon he obtained merchandise invoices from his employer's office, went to his employer's cold room, obtained five of the 5-gallon packers of ice cream, each weighing 60 to 80 pounds, and each having four metal gliders on the bottom, and, in accordance with the practice which prevailed, probably carried or dragged them out of the cooler a distance of about 24 feet onto the sidewalk and then to the place where he had parked his truck, the total distance being about 64 feet, and all the distance traversed being on a level plane.

Teater then mounted the cream truck to the top of the cream cans standing thereon, and in so doing probably used the brace which extended downward from the body of the truck immediately back of the truck's cab, all in his usual customary manner; a coemployee then "tossed" the 5-gallon packers of ice cream up to the top of the cream cans at a point just back of the cab's deck, Teater then stooped over, upended each packer of ice cream and lifted each a distance of six to eight inches onto the truck's deck; he then descended from the truck, from the right-hand side toward the front to the ground, and thereupon made a re-

mark to such coemployee that he, Teater, "nearly had another heart attack", and appeared sick and weak; Teater then walked around to the back end of the truck to its left-hand side, got into the truck's cab, reeled back and forth, lay down on the truck's seat to his right, sat up again, lay down again on the seat to his right, was gasping, had a "starey" look in his eyes and was perspiring. His coemployee then went to the opposite or right side of the cab, straightened out Teater's right arm and called for help from the office, observed Teater's face appeared drawn, flushed, covered with beads of perspiration, and that Teater appeared to expel his breath; all of the foregoing having occurred within a period of about ten minutes, i.e., from 7 to 7:10 o'clock on the morning of August 4, 1944. The office manager called a physician, who came at once to attend Teater, such physician, upon examination, pronounced Teater dead.

Claimant-appellant contends the Board erred in finding "that the death of Teater was not caused or accelerated, and the said disease of his heart was not aggravated, increased or accelerated, as the result of any unexpected, undesigned, or unlooked for mishap"; in finding that the coronary thrombosis Teater suffered on the morning of August 4, 1944, resulting in his death was not an event "happening suddenly and connected with his employment by the defendant, Dairymen's Cooperative Creamery of Boise Valley, employer, and which can be definitely located as to the time when and the place where it occurred, causing an injury by accident which resulted in violence to the physical structures of the body"; in finding "that Teater's work for said employer did not augment or accelerate any injury resulting from, or personal injury caused by an accident arising out of and in the course of his said employment", on the ground such findings are contrary to and are not supported by the evidence.

At the hearing before the Board claimant called Dr. Radford I. Ross, Dr. C. M. Kaley, Dr. Samuel D. Simpson and Dr. S. M. Poindexter, a heart specialist. Dr. Ross testified on direct examination:

"Q. Were you acquainted with Chester Otis Teater during his lifetime? A. Yes.

"Q. Was he at any time during the year 1944 a patient of yours? A. He was a patient of mine in 1944.

"Q. When did you see him, Doctor, do you recall? A. I saw him for the first time on July 9th. I was called out to see him.

"Q. Were you called out to his home here, some eight or nine miles west of Caldwell? A. Yes, that is right.

"Q. State what you found at that time. A. At the time I saw Mr. Teater he was in very evident pain. He was in the house. He had his work clothes on and he was suffering considerably. He was bending over a chair when I saw him and he was holding his hand to his chest, and I noticed there

were beads of perspiration on him. It was very evident that he was in shock. I proceeded then to examine him and made my diagnosis of coronary thrombosis. What else do you want besides that?

"Q. State what treatment you gave. A. At that time I gave a hypodermic of morphine, and I gave some nitroglycerin to take, and I gave him some tablets. I stayed there a while until he became more comfortable. He couldn't lie down. He sat in a chair. I advised him—I told the wife that I should perhaps see him if he wasn't better. I had never known Mr. Teater before. I was just called on this emergency condition, and I told her to contact me later if he didn't improve. I didn't see him for approximately a week and at that time he came to my office and he was considerably improved, said he felt better and I advised him then to stay home and get to bed if he possibly could. He objected. He didn't want to get to bed. He was an active fellow and didn't want to get to bed. He promised to be quiet, and he did.

"Q. Did you see him after that? A. Yes, I saw him, the next time was about July 22nd, and at that time he was still more improved. I asked what he had been doing and he said working around the house, digging some post holes, and I admonished him about that, that was the wrong type of work, if he wanted to go on with some degree of comfort he must not do that. He says, 'I shouldn't do that, I guess,' he said it didn't hurt him, but he said he had a little pain, and 'I have to do something,' he said. He said he hadn't returned to work. I told him not to go down there and work any more because of his condition—things could happen to you. He didn't like it very well but I talked to him a little and he left and the next I heard—I was called one morning. I was out and they needed a doctor in an emergency and I was informed Mr. Teater had collapsed and had died down there at the creamery. That is the extent of my knowledge on the case.

\*    \*    \*    \*    \*    \*

"Q. Did he appear to you from your examination and what you saw later in the month of July to be a rather typical case of coronary thrombosis? A. Yes."

On cross-examination, Dr. Ross testified:

" 'To the extent that he did perform these acts against your medical advice, would you classify his acts in that regard as unreasonable, and following unreasonable practices against the advice of his physician?' A. I may state, I didn't prescribe any acts for him not to perform. I wanted him at rest. I didn't know about the post holes—I didn't know about that. I had nothing to do with that. I told him I wanted absolute rest. I didn't anticipate the post holes.

"Q. Anything he would do having to do with physical exertion would be against your advice, is that right? A. Yes.

"Q. And against the treatment you prescribed? A. Yes, I told him rest and I meant rest, and digging post holes is not restful.

"Q. Doctor, you had not yet released him from your treatment for this coronary on August 3, 1944, had you? A. I hadn't released him on July 22nd as far as having him stop or begin work, I hadn't released him.

"Q. The fact that he—you knew that he was a cream hauler, didn't you? A. Yes.

"Q. And the fact that in hauling cream he has to handle anywhere from 32 to 38 10-gallon cream cans, weighing from 105 to 110 pounds apiece, load them a distance of 44 inches from the ground, would you recommend that type of work? A. No. That is very strenuous work. No.

"Q. You didn't release him from your care to go back to work on August 3rd? A. No, I told him not to go to work.

"Q. You told him not to go to work? A. Yes.

"Q. As a matter of fact, some time in the latter part of July he told you he wanted to go back to work, and you told him not to? A. He asked me on July 22nd if he could go back. I was rather surprised to hear he had gone back to work."

On re-cross examination, Dr. Ross testified:

"Q. On July 8th, would that indicate to you the process of an occlusion of the coronary? A. It well could.

"Q. In the light of what you found on July 9th, of course? A. Yes.

"Q. That would be likely, would it not, Doctor? A. It is likely.

"Q. Now the fact that he had this attack on August 4, 1944, that would mean a continuation of the symptomatology, would it not, Doctor, as it became evident on July 8th and July 9th. * * * an indication of a continuation? A. Yes, I believe so.

* * * * * *

"Q. Then it is not unreasonable to assume this thing had been gathering for some little time, is it? A. As far as I know when I saw him on July 9th.

"Q. Any of the various types of exertion that you ascertained he had been performing from July 9th on, or July 15th on would be conducive of the end result of death, wouldn't it? A. Yes.

"Q. So that it is impossible, Doctor, to claim the slight exertion which this man was shown to perform on the morning of August 4, 1944, to be the single contributing factor of death, isn't that true? A. It would be impossible to say?

"Q. Yes. A. No.

"Q. It would be just as likely that anything else you know he performed might have caused it? A. It is very probable

from that severe strain of climbing onto the truck and climbing down after handling those cans precipitated this thrombus. That is the reason we warned him. That is the reason we tell them to avoid physical strain.

\* \* \* \* \* \*

"Mr. Smith: Now would you answer the question, the matter of your opinion. A. Any exertion might have caused the condition. Any exertion that this man undertook, as far as I am familiar with the case from July 9th, any type of exertion could have caused that condition, but it so happened the climbing of the stairs and the work around the farm did not precipitate the condition. It could have been possible in any one of those things, but it didn't."

Dr. C. M. Kaley, called by claimant, testified on direct examination:

"Q. Dr. Kaley, you have heard the hypothetical question which was propounded here? A. Yes.

"Q. Do you have an opinion after hearing the hypothetical question as amended and completed, as to what caused the death of Chester Teater on August 4, 1944? A. I have.

"Q. Will you state that opinion? A. I think he died of coronary thrombosis.

"Q. And do you have an opinion, Doctor, after hearing the testimony of what he had done, and taking into consideration the hypothetical question, and particularly his work that he was employed in at that time,

of what precipitated the coronary thrombosis resulting in his death? A. The fact that he had a coronary disease, the exertion that he performed at that time was sufficient to cause the thrombosis.

"Q. And is it your opinion that that is the probable and precipitating cause of his death? A. I think so."

On re-cross-examination, Dr. Kaley testified:

"Q. You have made a distinction, Doctor, I believe that this coronary thrombosis being a disease, that the exertion at the time was sufficient to cause the thrombosis? A. I didn't say that he had coronary thrombosis at that time. He had, evidently, a stenosis of the coronary artery.

"Q. That stenosis, of course, was caused by a previous coronary thrombus or something which occluded the coronary, in your opinion? A. I didn't say a clot occluded it, but it was occluded, but he wouldn't have the thrombus until he already had the stenosis.

"Q. The stenosis itself, that was not new, in your opinion, but something which occurred prior to July 9, 1944? A. I don't know when it occurred.

"Q. I didn't ask you the actual fact as to when it occurred. I asked your opinion as to the likelihood of it. There is a difference in asking you the actual fact and your opinion. You must bear in mind he was distressed—he said he was sick on July 8,

1944, and July 9th Dr. Ross was called and found him in extreme, violent pain, diagnosed it as a coronary thrombosis, or coronary occlusion, now isn't it your opinion that at the time and prior to that time the coronary was stenosed? A. It was, in my opinion.

"Q. By virtue of some body, or by virtue of some condition that had occluded it? A. I think he had a stenosis at that time.

"Q. Now, we call that an occlusion, coronary,—do you know if it comes on rather suddenly or over a period of relatively a short time, a matter of a few hours or a few days? A. You mean in reference to the condition of shock that he was in at that time?

"Q. Yes. A. Well, he had to have a decreased amount of blood supply to his heart at that time to precipitate this.

"Q. Now, anyone who has that coronary condition must be very careful of himself for some period of time, does he not? A. Indeed.

"Q. Ordinarily what do you prescribe— do you prescribe bed rest, for instance? A. I do.

"Q. For a matter of weeks or a month? A. It depends on his cardiogram—I put them at rest.

\*　　\*　　\*　　\*　　\*　　\*

"Q. It is your opinion, is it Dr. Kaley, that on August 4, 1944, that the man then and there suffered this thrombus of the coronary, is it? A. Yes, he had a thrombus in the coronary vessel at that time.

"Q. But it wasn't completed then and there—it related back to at least July 8th or July 9th, didn't it? A. The thrombus wasn't. He had the stenosis at that time, but he had the thrombus on the 4th.

"Q. And the stenosed condition of the coronary affects the circulatory system of the heart muscles, doesn't it? A. That is right.

"Q. It decreases the blood supply, doesn't it? A. That is right.

"Q. And any continued exertion over a period of time you are just simply wearing out and starving that heart muscle, aren't you? A. Yes.

"Q. You are just getting it ready to collapse, aren't you? A. It is favorable under adverse conditions.

"Q. Now the fact that this man did exercise, he drove an automobile, he worked and did some tasks around home, helped dig post holes, he went on a couple of fishing trips and drove the automobile—that certainly is not conducive of mending that heart muscle so it could get well, is it? A. Not very favorable.

\*　　\*　　\*　　\*　　\*　　\*

"Q. The point I am getting at, Doctor, is this, that after this period of activity, from at least July 15th on until his death including going back to work on August 3,

162

1944, and boosting those cans around, weighing from 105 to 110 pounds, including that activity against the doctor's orders, that is not conducive is it, of bringing about the healing result? A. That was very favorable for the precipitation of this.

"Q. It relates back to the time when this thing became evident? A. Yes.

"Q. When he said he became sick—doesn't it? A. Yes."

Dr. Samuel D. Simpson, called by claimant, testified on direct examination:

"Q. You have heard the hypothetical question that has been propounded here? A. Yes.

"Q. Now, considering that hypothetical question and the facts involved and as we have amended it in the record, and then considering the amendments to the hypothetical question, have you an opinion as to what caused the death of Chester Teater on the morning of a August 4, 1944? A. Yes, I have.

"Q. Will you state that opinion? A. It is my opinion that this man died of a coronary thrombosis based upon the pre-existing coronary artery disease and precipitated by the exertion just prior to his death."

On cross-examination Dr. Simpson testified:

"Q. You stated based upon the previous history of the disease? A. The pre-existing coronary artery disease.

"Q. That relates back to at least July 9, 1944? A. I am not too clear on the date, but it would be back to the time he was first seen and a diagnosis of coronary thrombosis.

"Q. By Dr. Ross? A. Yes.

"Q. Now you say that it relates from that time? A. That the coronary artery disease relates from that.

"Q. At least from that time? A. At least from that time.

"Q. And the disease would have to gradually progress to some extent to become evident on July 9th? A. That is right. All cases of coronary artery disease show a gradual diminished heart reserve, and as that heart reserve diminishes it requires less and less physical effort to produce a thrombosis.

"Q. You classify it as a disease in this case? A. The coronary artery was the seat of a disease which was pre-existing.

"Q. And it comes on rather gradually? A. The coronary artery as a disease does come on gradually.

*       *       *       *       *       *

"Q. The fact that during this time when he was under Dr. Ross—as Dr. Ross' patient, commencing July 9, 1944, you would expect a patient of that character to remain very sedentary would you not, with that character of affliction and the severity of the affliction as testified to by Dr. Ross? A. I would expect him to be advised to

remain sedentary, but whether or not he would do it would depend upon his knowledge of the disease.

"Q. Yes. You would expect a man with a severe attack—or coronary attack that Dr. Ross testified that he did suffer, he would not be expected to drive an automobile, would he, or go on fishing trips, or do a little work around his acreage, or dig any post holes or climb stairs? A. The answer is the same. I would expect him to be advised against it, but what he would do would depend on how convinced he was that he had a coronary disease. * * *

"Q. The fact that up to July 9, 1944, he was not subjected to any unusual strain or stress in accordance with the record, Doctor, wouldn't that lead you to the opinion that this disease was gradually progressing up to that point until it became evident? A. That is right.

"Q. And the fact that the man performed his work, and you know what type of work he was performing in accordance with the hypothetical question, and that he performed that for two years and two months before that, his work had nothing to do with it? A. Not at that time, no. It was time—time was the only factor that increased his coronary artery disease.

"Q. Then after this disease became so violently evident in July—July 9, 1944, anything that the man might do at all would aggravate it, would it not? A. I think, that only if he exerted himself sufficiently to use up all the remaining heart reserve and produce a coronary thrombosis, would it aggravate it any more than time alone."

Dr. S. M. Poindexter, a heart specialist, called by claimant, on direct examination, testified:

"Q. What percentage of your cases would you say have to do with the heart and heart disturbances? A. I don't believe I could state any definite percentage. A large number of my cases are cardiac problems.

"Q. Are heart cases referred to you by other physicians, Doctor? A. Yes.

"Q. In Boise and elsewhere? A. Yes, they are.

"Q. And you have made a practice, have you, of keeping up on the latest literature and medical opinions with respect to heart diseases and heart trouble? A. Yes.

"Q. Now, Doctor, you heard the hypothetical question as it was read here—you were in the court room, were you not, and heard it? A. Yes.

"Q. And you were present when practically all of the witnesses testified and heard their testimony? A. Yes.

"Q. Now then, basing your opinion upon the hypothetical question submitted to you, and the amendments that were made here in your presence, I will ask you to state if you have an opinion as to the cause of the death of Mr. Teater? A. Yes.

"Q. Will you tell the Board here what that opinion is? · A. Well, it is my opinion, based upon the testimony I have heard —

"Q. Based upon the hypothetical question? A. —that this man died of a cardiac accident, and to be more specific, a coronary occlusion.

"Q. I wonder if you would tell the Board what a coronary occlusion is? A. A coronary occlusion is a plugging of either the right or left coronary artery, or any of its branches, by any kind of solid matter, or it may even be liquid. It will not mix with the blood, in such a way as to obstruct the circulation of blood through the arteries.

· "Q. From the facts related in the hypothetical question, do you have any opinion as to the precipitating cause of the coronary thrombosis? A. Yes.

"Q. Will you tell the Board what that is? A. It is my opinion that the strain or physical exertion was the precipitating cause of the coronary occlusion, most probably due to a thrombus which occurred at the time this man was exerting on the milk truck.

"Q. Why do you relate the coronary thrombus to the work he was doing on the milk truck that morning of August 4, 1944? A. Because of the fact that his symptoms—he apparently was symptomless when he came to work, and in the course of his morning's work, which includes climbing onto the truck and loading the ice cream packers and climbing down off the truck, immediately following that he complained of chest pains and stated that he thought he had had a heart attack, and those who saw him noted that he was obviously acutely ill. The fact that this came on immediately after he finished this work, or it may have been in the course of his work, we don't know. He said when he got down—he complained of discomfort, at any rate, and walked around the truck and sat in the seat where he expired, and to me that is clear evidence that exertion was a factor, if not the entire factor in producing the coronary occlusion.

"Q. What exertion do you refer to? A. It could have been the exertion of climbing onto the truck, the lifting of the ice cream packers, or it might have been the result of climbing down off the truck.

"Q. But you have reference to the exertion that occurred immediately preceding the attack? A. Yes."

On cross-examination, Dr. Poindexter testified:

"A. His distress came on while exerting on July—while in the course of his employment, and that he went home in distress and the next day he called Dr. Ross, and according to my understanding, my diagnosis would have been a coronary occlusion.

"Q. You call it a disease, however, do you not? A. Yes.

"Q. And this disease must have been progressing for some time? A. Yes.

"Q. The hypothetical question shows no unusual happening or accident of any kind or character other than his performance of his usual and ordinary work for a period of over two years and two months prior to July 8th or July 9, 1944. You are taking that into consideration too, aren't you, Doctor? A. Yes.

"Q. And this thing was gradually building up on the man as a matter of disease, was it not? A. Yes.

"Q. And it became very violently evident on July 9th when he became practically in extremus because of the pain. A. Yes, but a coronary occlusion occurs all at once, not gradually—a complete occlusion.

"Q. How do you account for the fact he had distress before that? A. He could have had the occlusion on the 8th.

"Q. But with the stenotic character of the vessel, that is quite sufficient to cut off all of the blood supply? A. That is not my understanding. By coronary occlusion we mean the complete occlusion of the blood vessel, not partial.

"Q. What do you mean by thrombosis? A. Thrombosis? A coronary occlusion due to a thrombus.

"Q. One is the end result, the causative character—the terminology is used rather loosely sometimes? A. The correct terminology would be coronary occlusion, and the most common cause is a thrombus.

"Q. In view of your statement to the effect that if a man suffers an occlusion it hits him all at once, nevertheless the symptomatology of the distress might come on rather gradually, might it not? A. Yes.

"Q. Then this case becomes a typical case, does it not, of progress of the disease, coronary disease,—does it not? A. Yes it is a typical case.

"Q. And from and after that date of July 9th anything that the man did after that with reference to exertion or work or stress or strain such as driving an automobile, or climbing stairs or doing chores around the place, or digging post holes, or going fishing, those are things he shouldn't have done with that disease, aren't they? A. No he shouldn't have.

"Q. And all he was doing was building up the progress of the disease so that anything could have culminated it into death, isn't that true? A. He could have had a coronary occlusion on any of those tasks during that month. That is why we advise them that they must be quiet, that they must have bed rest for at least a month. If they don't follow our instructions—if for some reason they do not follow our instructions and have no symptoms and no occlusion occurs, we have the impression they are lucky and they do get by. Exertion is very definitely a factor. That is why we ask them to be quiet. * * *

"Q. What is your opinion as to whether it is important as to whether he should follow the advice? A. Not so much as to future occlusions, but to the one previously referred to, to allow it to be healed.

"Q. But the tendency is there for the future occlusions to occur if he doesn't obey these orders? A. That isn't all, the complications—the complications of a coronary occlusion—. * * * He would have a tendency to a future occlusion, but the fact that he doesn't obey orders doesn't mean that that is going to precipitate a coronary occlusion. It means we are protecting him from the first coronary occlusion and the complications of it.

"Q. One of those complications might be death, if he doesn't obey orders? A. Not necessarily."

On re-direct examination, Dr. Poindexter testified:

"Q. I don't know whether you said it was possible or probable, but you said he might have had a coronary occlusion on July 9th at the time of his first attack? A. Yes.

"Q. Would you say this was the same coronary occlusion he suffered immediately prior to his death? A. No.

"Q. In other words, it is a separate and distinct coronary occlusion? A. Yes.

"Q. What would you say from the history given in the hypothetical question, what happened to the first occlusion, had that healed up to some extent? A. The occlusion remains. It isn't the occlusion itself, it is the injury to the heart muscle—it is the heart muscles you are trying to protect by rest, and which if not protected may lead to a softening of the muscle, and the muscle already being soft might lead to a rupture of that heart muscle. If they disobey orders and get by without difficulty, we just figure they are lucky.

"Q. What you have said on cross-examination is to the effect that the work performed immediately prior to the attack and death was the precipitating and aggravating cause? A. Yes."

During the course of the trial it was stipulated, so far as material here, that: "Mr. Smith: I will stipulate. * * * that Teater worked on a ranch for three years; that during the summer of 1927 he worked at logging, then he worked at ranch work for three years during the winter seasons. During the summer he did some timber work, and for several years thereafter he pruned orchards and did general work, and then operated his own truck line for five years. That since their marriage, so far as she knew [Teater's wife], he enjoyed good health except a period of indigestion which he suffered in 1939, and minor illnesses; that after he suffered that heart attack on July 9, 1944, he remained home for one week and then they went on a fishing trip in the Lowman area for a week, and then after that they went into the Silver City country for another fishing

trip for about three days. Is that sufficient?"

Dr. F. M. Cole, called by respondent, testified on direct examination:

"Q. Now the question is, what in your opinion, caused the man's [Teater] death? A. Coronary occlusion. * * *

"Q. The fact that from and after July 15, 1944, he engaged in these various activities which I have asked you to assume, Doctor, what would be the effect of those activities on this man's heart? A. I think the effect of that would be to deter the healing of the damage that he had received to the heart at the time he had the original coronary occlusion. I don't believe those activities had any particular thing to do with a separate and distinct coronary occlusion he had in a different set of vessels at a later time. * * *

"Q. Then, Doctor, what opinion do you entertain with reference to these tasks which the man performed during the period of about ten minutes on the morning of August 4, 1944, bearing in mind that he drove his own automobile to the creamery garage, a distance of eight miles, and then he got the creamery truck and drove it four or five blocks to the creamery and he, in all probability, drug these ice cream containers out from the cooler a distance of 40 feet, and climbed on to the truck and they were boosted up to him and he lifted them then six or eight inches up to the upper deck, would that have anything to do with the attack of coronary? A. I don't think it would. * * *

"Q. * * * What is your opinion as to whether or not stress and strain and exertion would enhance the coming, or the probability of the coming on of the second occlusion,—that is, would it enhance the chances of the second occlusion occurring? A. I don't know as it would have any effect."

On cross-examination, Dr. Cole testified:

"Q. When he [Teater] went to work he was in a weakened condition? A. Yes, I think that he was.

"Q. Definitely in a weakened condition? A. Yes.

"Q. Any exertion he performed on the morning of August 4th would probably affect him adversely where it might not have affected a normal person? A. It might have affected him adversely, but not a coronary occlusion. It might affect a damaged heart, and if the exertion was enough to kill him, but it didn't—what he had the second time was a new coronary occlusion, but his work didn't do it.

* * * * * *

"Q. I would go a long ways before I would say that exertion would cause it, but I wouldn't say that a tremendous exertion might not precipitate an attack, and yet I don't know that it does. * * *

"Q. These symptoms, extreme weakness, the perspiration on his face and fore-

·head, doesn't that indicate to you that there was' rather a sudden injury to the heart ·at that time? A. It don't take an argument to say this man had a sudden thing happen to that heart. He sure did. When a man gets a coronary occlusion, he has a sudden tremendous injury to his heart, whether he sweats or whether he don't, ·Ye Gods, he has got it."

Dr. Ralph Jones, called by respondent, testified on direct examination:

"Q. You will assume the facts therein stated, are true, and I will now ask you the question, have you an opinion as to what caused the death of Mr. Teater? A. I have.

"Q. Will you state that opinion? A. Coronary occlusion.

"Q. What is your opinion as to what the causative factors of that coronary occlusion on August 4, 1944, were? A. Diseased coronary vessels.

"Q. What is the usual treatment for a heart afflicted with coronary occlusion? A. Opiates for the relief of pain and absolute bed rest, supportive treatment.

"Q. From the hypothetical statement of facts relating to the heart spell which this man had on July 9, 1944, what is your opinion as to whether or not that spell was mild or severe, the first attack? A. A coronary occlusion, I feel, is always severe.

"Q. In your opinion, how long should the man have lived a sedentary life, observed rest and stayed away from anything requiring exertion after that incident of July 9, 1944? A. Depending upon the severity of damage to the heart muscles, it varies from three weeks to three months.

"Q. And then after that initial period of rest, how long do you ordinarily require a man to stay away from exertion? A. Another, sometimes, equal period of time. * * *

"Q. Does the incident of a second occlusion have anything to do with the element of. exertion, assuming that this man did have a second coronary occlusion on August 4, 1944? A. I feel that subsequent exertion plays a factor in the production of a subsequent occlusion. * * * I feel that all exertion has something to do with it.

"Q. So that any exertion whatever with that kind of a heart, no matter what the man did, would be a causative factor? A. I feel that it would, yes."

On cross-examination, Dr. Jones testified:

"Q. Now if digging the post holes might precipitate his death, then do you mean to tell the Board that performing the acts which he did that morning of August 4th, pulling himself upon the truck, as you have heard, and lifting these other articles, the ice cream packers, and getting back down off the truck and doing those things, do you mean to say that those did not precipi-

tate his death? A. Those are events leading up to his death, such as climbing into the truck immediately prior to his death.

"Q. Do you think that contributed at that particular time to his death? A. I think they were a factor. * * *

"Q. He got down off the truck, as you have heard the testimony, and put his hand on his heart and said, after performing these acts, 'I almost had another heart attack,' and he looked pale, and the man that was with him was worried about him and followed him around the truck, do you still say that those acts were not the precipitating factor in his death at that particular time, taking his heart as you found it on August 4th, that morning? A. The last act of jumping down off the truck and complaining of pain, you would assume that something had happened to his heart, and then he climbed into the truck and put another added occlusion on a previously damaged heart and led to his death.

"Q. And do you say that those were factors contributing to his death at that particular time, the exertion at that time was a factor contributing to his death? A. Yes."

It will have been observed the doctors—those testifying for claimant as well as Drs. Cole and Jones called by respondents—testified Teater died from coronary thrombosis, *a typical case of coronary thrombosis,* and the Board so found. As to that there is no dispute. The decisive question of fact, then, is: Did the exertion incident to the work being performed by deceased at the time of his death cause an accident accelerating or aggravating the pre-existing diseased condition of his heart, thereby precipitating the coronary occlusion which caused his death? On that pivotal question, when boiled down, and in the last analysis, there is actually and really no dispute in the evidence, as will presently appear by directing special attention to the following testimony:

Dr. Kaley, called by claimant, testified:

"Q. And do you have an opinion, Doctor, after hearing the testimony of what he [Teater] had done, and taking into consideration the hypothetical question, and particularly his work that he was employed in at that time, of what precipitated the coronary thrombosis resulting in his death? A. The fact that he had a coronary disease, the exertion that he performed at that time was sufficient to cause the thrombosis.

"Q. And is it your opinion that that is the probable and precipitating cause of his death? A. I think so."

Dr. Poindexter, the heart specialist, called by claimant, testified:

"Q. From the facts related in the hypothetical question, do you have any opinion as to the precipitating cause of the coronary thrombosis? A. Yes.

"Q. Will you tell the Board what that is? A. It is my opinion that the strain

or physical exertion was the precipitating cause of the coronary occlusion, most probably due to a thrombus which occurred at the time this man was exerting on the milk truck.

"Q. Why do you relate the coronary thrombus to the work he was doing on the milk truck that morning of August 4, 1944? A. Because of the fact that his symptoms—he apparently was symptomless when he came to work, and in the course of his morning's work, which includes climbing onto the truck and loading the ice cream packers and climbing down off the truck, immediately following that he complained of chest pains and stated that he thought he had had a heart attack, and those who saw him noted that he was obviously acutely ill. The fact that this came on immediately after he finished this work, or it may have been in the course of his work, we don't know. He said when he got down—he complained of discomfort, at any rate, and walked around the truck and sat in the seat where he expired, *and to me that is clear evidence that exertion was a factor, if not the entire factor in producing the coronary occlusion.*"

Dr. Cole, called by respondents, testified:

"Q. I would go a long ways before I would say that exertion would cause it, but I wouldn't say that a tremendous exertion might not precipitate an attack, and yet I don't know that it does. * * *

"Q. These symptoms, extreme weakness, the perspiration on his face and forehead, doesn't that indicate to you that there was rather a sudden injury to the heart at that time? A. *It don't take an argument to say this man had a sudden thing happen to that heart. He sure did. When a man gets a coronary occlusion, he has a sudden tremendous injury to his heart, whether he sweats or whether he don't,* Ye Gods, he has got it."

Dr. Jones, also called by respondent, testified:

"Q. He got down off the truck, as you have heard the testimony, and put his hand on his heart and said, after performing these acts, 'I almost had another heart attack,' and he looked pale, and the man that was with him was worried about him and followed him around the truck, do you still say that those acts were not the precipitating factor in his death at that particular time, taking his heart as you found it on August 4th, that morning? A. The last act of jumping down off of the truck and complaining of pain, you would assume that something had happened to his heart, and then he climbed into the truck and put another added occlusion on a previously damaged heart and led to his death.

"Q. *And do you say that those were factors contributing to his death at that particular time, the exertion at that time was a factor contributing to his death?* A. *Yes."* (Emphasis added.)

█ It thus appears there is really and actually no substantial dispute in the evi-

dence, as we understand it, on two important propositions: First, Teater had a coronary disease both before and at the time of his death, and, second: The work he was doing at the time of his death caused an accident accelerating or aggravating such diseased condition, thereby precipitating coronary occlusion, causing death. That, of course, presents the question of law: Where the work of an employee aggravates or accelerates a previous diseased condition of the heart of such employee, precipitating coronary occlusion causing death, are dependents entitled to compensation?

First, and as this court held some twenty years ago in Re Larson, 48 Idaho 136, 143, 279 P. 1087, 1089: "Our statute prescribes no standard of fitness, makes no distinction between the sound and the unsound, which, being true, compensation under the act is not based on an implied warranty of perfect health or immunity from latent or unknown tendencies to disease." Secondly: This court has uniformly held compensation is recoverable where the work of an employee causes an accident which aggravates or accelerates a previous diseased condition of the worker, causing death (Cain v. C. C. Anderson Co., 64 Idaho 389, 396, 397, 133 P.2d 723, 726, pointing out: "The fact that the deceased was suffering or afflicted with a serious heart ailment, predisposing him to coronary occlusion, was of no consequence in the case, and the fact that he might or would have died in a week or year with coronary occlusion was immaterial."

In closing the discussion of this angle of the case at bar, we think it should be further pointed out that Teater was stricken and died while in the performance of his regular duties, so that there can be no question whatsoever that the accident resulting in death arose out of and in the course of his employment.

There is another matter, however, to which we desire to direct attention. Respondent, Dairymen's Cooperative Creamery, following the accident and on August 10, 1944, pursuant to and as required by sec. 43-1801, I.C.A., filed with the Industrial Accident Board a report of the accident involved in the case at bar, which report was incorporated in and made a part of the record on appeal of this case. Sec. 43-1801, supra, requires, among other things, that an employer report "the nature and cause of the injury" to its employee. In complying with the statute, respondent Creamery reported the nature of the accident thus: "Heart, increased effort and exertion in connection with loading truck caused coronary occlusion *thormbus* [thrombus]. The coronary occlusion caused the death of decedent [Teater]", thus characterizing the incident as an accident.

The Board in passing on the right of claimant to recover compensation entirely overlooked the *report* of the employer, *showing the nature of the injury,* which

, constitutes prima facie evidence *that the accident and injury were as so reported.* Sater v. Home Lumber & Coal Co., 63 Idaho 776, 783, 784, 126 P.2d 810; Larson v. Independent School Dist. No. 11J, 53 Idaho 49, at page 53, 22 P.2d 299; Empire Zinc Co. v. Industrial Comm. of Colorado, 94 Colo. 98, 28 P.2d 337; Northeast Oklahoma R. Co. v. State Indus. Comm., 88 Okl. 146, 212 P. 136; Ideal Bakery v. Schryver, 43 Wyo. 108, 299 P. 284.

That brings us to respondents' contention Teater returned to work in August "absolutely against the [his] doctor's order", and further, that, and as in substance insisted by respondents at the bar, Teater's doctor warned him that if he returned to work death would probably result. The evidence in the case at bar does not support either contention. The fact is, that Teater could not have returned to work absolutely against his doctor's order because Teater's doctor (Dr. Ross) testified he "didn't prescribe any acts for him [Teater] not to perform", from which it may also be fairly concluded Teater did not know, and had no good reason to believe, his heart was in such a condition as to endanger his life if he returned to work. Respondents insist, however, that the case at bar is controlled by Walters v. City of Weiser, 66 Idaho 615, 164 P.2d 593, 597.

In the case at bar there is a very substantial and material difference in the facts. Here, as above pointed out, there is really and actually no substantial dispute in the evidence, that it was the work Teater was doing at the time of his death which caused an accident accelerating the diseased condition of his heart, and that it was the acceleration which precipitated coronary occlusion, causing Teater's death. Hence, in the instant case, it is just a matter of invoking the applicable rule of law, as we have done. On the other hand, in the Walters case, supra, it does not appear it was just the work he was performing for his employer which accelerated the weakened condition of his heart to such an extent as to cause death. Instead, it appears Walters while quite sick with the "flu" continued to work for a period of ten days, and then and while still quite sick arose from a sick bed and attended an evening meeting of a fire department (clearly outside of any duty he owed his employer), after which he steadily grew weaker and died. As stated by this court: "Though one cannot help but admire such courage, * * * it leaves us no choice but to hold that the Board's order [denying claim for compensation] should be affirmed". It is obvious the Walters case, supra, is not in point here.

It follows the order of the Board denying compensation must be reversed and the cause remanded, and it is so ordered, with directions to the Board to make findings of fact and conclusions of law in harmony with the views expressed in this opinion, and enter thereon an appropriate

order awarding compensation. Costs awarded to appellant.

GIVENS, C. J., and BUDGE, MILLER and HYATT, JJ., concur.